**In the Matter of ASCOT MORTGAGE, INC., Debtor.**

**W.H. WILLSON, Jr., as Chapter 7 Trustee of the Bankruptcy Estate of Ascot Mortgage, Inc., Plaintiff,**

v.

**MLA, INC., Defendant.**

**Bankruptcy No. A89–04814–ADK. Adv. No. 91–6596.**

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

April 9, 1993.

G. Frank Nason, IV, Atlanta, GA, for plaintiff.

Robert A. Parker, Rogers & Hardin, Atlanta, GA, for defendant.

### MEMORANDUM OF OPINION AND ORDER

A. DAVID KAHN, Chief Judge.

W.H. Willson, Jr., as Chapter 7 Trustee of the Bankruptcy Estate of Ascot Mortgage, Inc. ("Plaintiff–Trustee"), filed the above-styled adversary proceeding (the "Complaint") against MLA, Inc. ("Defendant") to 1) object to Defendant's proof of claim ("Objection to Proof of Claim Count"); 2) avoid certain transfers pursu-

ant to 11 U.S.C. § 544 (the "Section 544 Count"); 3) set aside alleged preferences pursuant to 11 U.S.C. § 547 (the "Preference Count"); and 4) recover certain payments received by Defendant (the "Recovery of Payments Count"). Defendant has filed a counterclaim in which it seeks the recovery of certain mortgage insurance premiums held by Plaintiff–Trustee ("Defendant's Counterclaim"). It is before the Court on cross-motions for summary judgment on the Section 544 Count and the Preference Count and on Defendant's motion for summary judgment on Defendant's Counterclaim. The Court finds this matter to be a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Court will address the Section 544 Count, Defendant's Counterclaim, and the Preference Count of Plaintiff–Trustee's Complaint below.

## I. The Section 544 Count

The Section 544 Count of Plaintiff–Trustee's Complaint raises issues dealing with the interplay among the Bankruptcy Code, laws in the states of Georgia, Florida, and Alabama governing the transfer of mortgages or deeds to secure debt, and the Uniform Commercial Code in a contest between a bankruptcy trustee and an entity participating in the secondary mortgage market. Plaintiff–Trustee is attempting to use the strong arm powers of § 544 to set aside certain transfers of mortgages and deeds to secure debt. The following facts are not in dispute.

### A. Undisputed Facts

On May 4, 1989, an involuntary Chapter 7 Petition was filed against Ascot Mortgage, Inc. (the "Debtor"). Defendant was one of the petitioning creditors. The Debtor converted the involuntary Chapter 7 case to a case under Chapter 11 on May 16, 1989, and consented to the appointed of an Examiner. Subsequently, the case was reconverted to a Chapter 7 case on June 8, 1989, and Plaintiff–Trustee was appointed Chapter 7 trustee of the Debtor's bankruptcy estate.

Prior to the filing of the involuntary bankruptcy petition, the Debtor was in the business of originating FHA- or VA-approved loans primarily secured by residential real property. The Debtor would advance funds to the owners of residential real property and take back a promissory note and a mortgage or security deed on the residential real property as security for the debt. The Debtor would then assign the mortgage or security deed to participants in the secondary mortgage market, including Defendant. Plaintiff–Trustee's Statement of Material Facts Not in Dispute filed August 20, 1992 at 1.

On or about May 27, 1988, the Debtor and Defendant entered into a purchase agreement (the "Purchase Agreement") for the purchase of certain mortgages and security deeds. See Exhibit A attached to Defendant's Statement of Material Facts Not in Dispute filed September 15, 1992. The Purchase Agreement required the Debtor to record the assignment of each mortgage or security deed at its expense. See Purchase Agreement, Schedule "A" ¶ 3 attached as Exhibit A to Defendant's Statement of Material Facts Not in Dispute. Defendant relied upon the Debtor to record the assignments. Defendant's Statement of Material Facts Not in Dispute at 2.

Pursuant to the Purchase Agreement and prior to the commencement of the Debtor's bankruptcy case, Defendant purchased certain mortgages and security deeds, including those described in Exhibits A and B attached to Plaintiff–Trustee's Statement of Material Facts Not in Dispute. Contemporaneously with Defendant's payment to the Debtor of the purchase price of each mortgage and security deed, the Debtor endorsed and delivered to Defendant the original promissory note evidencing the loan and also delivered to Defendant a copy of the mortgage or security deed securing the promissory note, a copy of the executed assignment of the mortgage or security deed, and certain other documents. Defendant's Statement of Material Facts Not in Dispute at 1–2. The assignments of the mortgages and security deeds listed in Exhibits A and B attached to Plaintiff–Trustee's Statement of Material Facts Not in Dispute (sometimes hereinafter referred to as the "Disputed Mortgages and Security Deeds") were never

recorded by the Debtor prior to the commencement of its bankruptcy case. There are 26 such mortgages and security deeds in question. The real property pertaining to the Disputed Mortgages and Security Deeds is located in Georgia, Florida, and Alabama.

### B. Conclusions of Law [1]

Plaintiff–Trustee seeks to set aside the transfers of the Disputed Mortgages and Security Deeds pursuant to § 544(a) of the Bankruptcy Code, which provides as follows:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

... or

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

Plaintiff–Trustee argues that, armed with the status of either a bona fide purchaser of real property under § 544(a)(3) or a judicial lien creditor under § 544(a)(1), he may avoid the assignments of the Disputed Mortgages and Deeds to Secure Debt because, as of the date of the commencement of the Debtor's bankruptcy case, those assignments were not recorded as required by applicable state law.

### 1. Section 541(d)

■ Defendant contends that § 541(d) of the Bankruptcy Code is dispositive of the Section 544 Count. Section 541(d) provides that

Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

Defendant argues that § 541(d) should be read broadly to exclude from a debtor's estate any property transferred on the secondary mortgage market.

The Court disagrees. It is clear from the plain meaning of the statutory language and the legislative history that Congress intended to protect the secondary mortgage market from intrusion by bankruptcy to the extent that title of a mortgage or security deed was left in the debtor's name for a purpose, such as servicing that mortgage. This is a common practice in the secondary mortgage market. *See* Charles L. Edson & Barry G. Jacobs, *Secondary Mortgage Market Guide,* § 3.03[4] at 3–19 to 3–20 (1991). However, there is nothing to indicate that Congress intended to protect a transfer where there was no such servicing agreement between the seller and the purchaser of the mortgage and the parties simply did not get around to recording the assignment.

---

1. As a preliminary matter, Plaintiff–Trustee has filed a Motion to File Supplemental Brief and has attached a brief entitled "Supplemental Brief in Support of Trustee's Motion for Summary Judgment and in Opposition to MLA, Inc.'s Cross–Motion for Summary Judgment."

Although the Court deems additional briefing unnecessary, it has considered Plaintiff–Trustee's Supplemental Brief. The Court finds that a further response from Defendant would not aid the Court in reaching its decision today.

Defendant relies upon the following cases for its broad interpretation of § 541(d): *In re Cambridge Mortgage Corp.*, 92 B.R. 145 (Bankr.D.S.C.1988); *Hatoff v. Lemons & Assocs., Inc. (In re Lemons & Assocs., Inc.)*, 67 B.R. 198 (Bankr. D.Nev.1986); *In re Mortgage Funding, Inc.*, 48 B.R. 152 (Bankr.D.Nev.1985); *Colin v. Fidelity Standard Mortgage Corp. (In re Fidelity Standard Mortgage Corp.)* 36 B.R. 496 (Bankr.S.D.Fla.1983), *aff'd,* 839 F.2d 1517 (11th Cir.1988); *In re Columbia Pacific Mortgage, Inc.*, 20 B.R. 259 (Bankr. W.D.Wash.1981). All of these cases are distinguishable on their facts from the proceeding *sub judice* in that the debtors involved in those cases had servicing contracts with the purchasers of the mortgages or participation interests in the mortgages. Here, it is undisputed that there was no servicing agreement between the Debtor and Defendant.

As Defendant has failed to cite even one case in which § 541(d) was applied to exclude an interest in a mortgage where the Debtor was not servicing the mortgage, the Court declines to find that § 541(d) will exclude the Debtor's interest, if any, in the Disputed Mortgages and Security Deeds. Furthermore, even if the Court were to interpret § 541(d) as broadly as Defendant advocates, it is very likely that § 541(a)(3) would operate to bring those interests back into the estate.

In *City Nat'l Bank of Miami v. General Coffee Corp. (In re General Coffee Corp.)*, 828 F.2d 699 (11th Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 699 (1988), the Eleventh Circuit Court of Appeals recognized the tension between § 541(d) and § 544(a), but it found that it did not have to resolve the apparent conflict in that case. Since the Court has already held that § 541(d) is not applicable in this proceeding, this Court likewise does not reach any conclusions regarding this conflict. However, the Court would point out that § 541(d) excludes property from

becoming property of the estate under subsections (a)(1) and (a)(2). It apparently does not preclude inclusion when property is brought into the estate under § 544(a) through § 550. *See* § 541(a)(3). The Court's analysis now turns to § 544(a).

### 2. § 544(a)

Plaintiff–Trustee contends that, with his status of a bona fide purchaser of real property and a judicial lien creditor pursuant to § 544(a)(3) and (a)(1), he can avoid the transfers of the Disputed Mortgages and Security Deeds to Defendant.[2] A closer look at the actual transfers is necessary before the Court can consider the avoidance of those transfers.

The transfers of the Disputed Mortgages and Security Deeds were made pursuant to the Purchase Agreement and effected by separate assignments of the mortgages or security deeds (the "Assignments") *and* the endorsement and delivery of the original notes (the "Notes") to Defendant. In the Complaint, Plaintiff–Trustee is seeking to set aside the transfers made by the Assignments on the ground that the Assignments were not recorded as required by applicable state law. The Assignments provided, in part, that

> The Assignor herein specifically transfers, sells, conveys, and assigns to the above Assignee, its successors, representatives and assigns, the aforesaid Security Deed, the property described therein, the indebtedness secured thereby together with all powers, options, privileges and immunities therein contained.

> The Assignor herein has this day sold and assigned to the Assignee herein the note secured by this deed and this transfer is made to secure the Assignee, its successors, representatives and assigns, in the payment of said note.

Assignment attached as an exhibit to Plaintiff–Trustee's Statement of Material Facts

---

**2.** Plaintiff–Trustee relies upon this Court's decision in *Willson v. Unity Mortgage, Inc. (In re Ascot Mortgage, Inc.)*, Adv. No. 91–6594 (Mar. 17, 1992) regarding Plaintiff–Trustee's right to recover under § 544. The Court finds that ad-

versary proceeding of no precedential value to the proceeding *sub judice* in that Defendant was not a party to that proceeding and defendant Unity Mortgage, Inc. did not raise any of the defenses Defendant has raised here.

Not in Dispute.[3]

It is Plaintiff–Trustee's position that setting aside the Assignments will set aside both the transfer of the Disputed Mortgages and Security Deeds *and* the Notes. However, as will be shown below, Plaintiff–Trustee cannot set aside the Assignments pursuant to § 544(a). Furthermore, even were this Court to find that Plaintiff–Trustee could avoid the transfers of the Assignments, Plaintiff–Trustee cannot defeat Defendant's interest in the Notes as Defendant holds the Notes as a holder in due course under the Uniform Commercial Code. Without recovery of the underlying debts or the Notes, the Disputed Mortgages and Security Deeds would serve no useful purpose for Plaintiff–Trustee or the estate. Thus, the Court would refuse on equitable grounds to set aside the transfers of the Assignments. To reach these conclusions, the laws of each of the three states involved and the Uniform Commercial Code must be examined separately.

**(a) The Law of the State of Georgia**

■ Pursuant to O.C.G.A. § 44–2–2(b), a transfer of a deed to secure debt must be recorded to be effective against a third party claiming superior rights to the same property. O.C.G.A. § 44–2–2(b) provides that

> [d]eeds, mortgages, and liens of all kinds which are required by law to be recorded in the office of the clerk of the superior court and which are against the interests of third parties who have acquired a transfer or lien binding the same property and who are acting in good faith and without notice shall take effect only from the time they are filed for record in the clerk's office.

*See also Burgess v. Simmons,* 207 Ga. 291, 298–99, 61 S.E.2d 410 (1950). However, even with the status of a bona fide purchaser under § 544(a)(3), Plaintiff–Trustee cannot prevail over the rights of Defendant for two reasons. First, Plaintiff–Trustee cannot use § 544(a)(3) to set aside a transfer of a deed to secure debt. Section

544(a)(3) gives a trustee the status of a bona fide purchaser of real property. Although in Georgia a transfer of a deed to secure debt transfers the legal title of the real property, *see Cross v. Citizens Bank and Trust Co.,* 160 Ga. 647, 128 S.E. 898 (1925), the Court finds that it is doubtful that Congress intended § 544(a)(3) to come into play when the underlying real property is not in dispute. *See In re Columbia Pacific Mortgage, Inc.,* 20 B.R. 259 (Bankr. W.D.Wash.1981). It must be remembered that the Debtor never owned an equitable interest in the underlying real property. Its only interest in the real property was through the deed to secure debt.

Second, it is impossible for a bona fide purchaser to exist under these circumstances. On the date of bankruptcy, the Debtor did not have possession of the Notes. Therefore, any purported purchaser of the Debtor's interest in the Disputed Mortgages and Security Deeds in Georgia (hereinafter sometimes referred to as the "Georgia Deeds to Secure Debt") would have had constructive knowledge that the Debtor could not produce and transfer the original notes. This would have put a purchaser on inquiry as to the state of the Debtor's ownership of the Notes and the Georgia Deeds to Secure Debt. In Georgia, a purchaser is subject to constructive notice. "Notice sufficient to excite attention and put a party on inquiry shall be notice of everything to which it is afterwards found that such inquiry might have led." O.C.G.A. § 23–1–17. Constructive knowledge will be imputed to Plaintiff–Trustee to defeat his attempt to use § 544(a)(3). *See Probasco v. Eads (In re Probasco),* 839 F.2d 1352, 1354–55 (9th Cir. 1988); *McCannon v. Marston,* 679 F.2d 13, 16–17 (3rd Cir.1982); *In re Terra Villa Apartments, Ltd.,* 101 B.R. 755, 758–59 (Bankr.N.D.Fla.1989). Therefore, Plaintiff–Trustee cannot avoid the Assignments using § 544(a)(3).

■ Similarly, Plaintiff–Trustee, with the status of a judicial lien creditor pursu-

---

**3.** The Parties have not attached each assignment in question. The Court assumes that this assignment is representative of the Assignments.

ant to § 544(a)(1), cannot avoid the transfers of the Georgia Deeds to Secure Debt and the Notes. In Georgia, "the lien of a judgment only attaches to such interest as the judgment debtor actually has in the property levied on." *Hartsfield Loan and Sav. Co. v. Garner,* 184 Ga. 283, 191 S.E. 119 (1937) (quoting *Owens v. Atlanta Trust & Banking Co.,* 122 Ga. 521, 50 S.E. 379 (1905); *see also Shivers v. Hunnicutt,* 220 Ga. 620, 140 S.E.2d 872 (1965). On the date of the bankruptcy, the Debtor owned no interest in the Georgia Deeds to Secure Debt and the Notes. Thus, Plaintiff–Trustee's interest in the Georgia Deeds to Secure Debt and the Notes is not augmented by § 544(a)(1), as a judicial lien creditor of the Debtor could attach only what interest the Debtor had on the date of the bankruptcy petition.

### (b) The Law of the State of Florida

■ The result under Florida law is the same as the result under Georgia law; to wit: Plaintiff–Trustee cannot avoid the Assignments pursuant to § 544(a)(1) and (a)(3). Unlike in Georgia, the granting of a security interest in real property in Florida does not transfer legal title to the property. Fla.Stat.Ann. § 697.02. Therefore, § 544(a)(3) cannot possibly be used to set aside the Disputed Mortgages and Security Deeds in Florida (hereinafter sometimes referred to as the "Florida Mortgages"), as the Debtor never possessed title to the underlying real property, but instead had only a lien upon the property.

■ Thus, Plaintiff–Trustee must rely solely upon his status of a judicial lien creditor pursuant to § 544(a)(1) to avoid the Assignments. Plaintiff–Trustee bases his entitlement to avoid the Assignments upon Fla.Stat.Ann. § 701.02(1), which provides that "[no] assignment of a mortgage upon real property or of any interest therein, shall be good or effective in law or in equity, against creditors or subsequent purchasers, for a valuable consideration, and without notice, unless the same be recorded according to law." Commentators and case law suggest that Fla.Stat. Ann. § 701.02 pertains to contests between the mortgagor (or his successor) and a mortgagee's successor. Thus, as between a mortgagee and the mortgagee's successor, Fla.Stat.Ann. § 701.02 has no application.

[T]he Florida recording statute, in common with those of many other jurisdictions, extends protection only to subsequent purchasers for value and mortgagees and other lien claimants against the *underlying land* (i.e., those operating in the mortgagor's world). They do not apply to those operating in the mortgagee's world.

Where the matter has been carefully considered, the courts have recognized that the recording acts, if they apply at all, apply only as between the assignee or other claimant in the mortgage and the owner of the underlying land or those who claim through him; they do not apply as between competing assignees or successive claimants *in the mortgage.*

Jan Z. Krasnowiecki, *et al., The Kennedy Mortgage Co. Bankruptcy Case: New Light Shed on the Position of Mortgage Warehousing Banks,* 56 Am.Bankr.L.J. 325, 336 (1982) (emphasis in original) (footnote omitted). In the case of *Chandler v. Davis,* 139 Fla. 469, 190 So. 873 (1939), the court did not apply Fla.Stat.Ann. § 701.02 to resolve competing interests to a note and mortgage. This indicates that the position taken by the commentators above is correct. Thus, with the inapplicability of Fla. Stat.Ann. § 701.02, a judgment creditor would not prevail over the right of the Defendant to the Florida Mortgages and the Notes.

Even if Fla.Stat.Ann. § 701.02 were somehow found to be applicable, constructive knowledge would be imputed to Plaintiff–Trustee to defeat his claim. A creditor would have notice that the Debtor did not have possession of the Notes and would, thus, be put on inquiry as to any competing claims to the Notes. *See Hulet v. Denison,* 146 Fla. 478, 1 So.2d 467, 469 (1941).

### (c) The Law of the State of Alabama

■ As has been found under Georgia and Florida law, Plaintiff–Trustee's at-

tempt to avoid the Assignments pursuant to § 544(a)(1) and (a)(3) must likewise fail under the law of Alabama. Plaintiff–Trustee relies upon Ala.Code § 35–4–90(a) which provides that

> All conveyances of real property, deeds, mortgages, deeds of trust or instruments in the nature of mortgages to secure any debts are inoperative and void as to purchasers for a valuable consideration, mortgagees and judgment creditors without notice, unless the same had been recorded before the accrual of the right of such purchasers, mortgagees or judgment creditors.

First, it should be noted that there is no requirement that transfers of mortgages and notes be recorded. In *Lewis v. Cannon*, 22 Ala.App. 634, 118 So. 911 (1928), the court stated that "We know of no law, and the appellant has cited us to none which requires a record of the transfer of a mortgage in order to make it valid." *Id.* 118 So. at 912.

As in Georgia and Florida, bona fide purchasers and judgment creditors in Alabama are subject to constructive notice. Ala.Code § 35–4–90(a); *Baldwin County Fed. Sav. Bank v. Central Bank of South*, 585 So.2d 1279, 1281 (Ala.1991). As discussed above, the Debtor could not have produced the Notes after they were transferred to Defendant. Therefore, subsequent purchasers and creditors would have been put on inquiry as to the Debtor's actual interest in the Notes and Mortgages. Consequently, under Alabama law, Plaintiff–Trustee cannot avoid the Assignments pursuant to § 544(a).

### d) The Uniform Commercial Code

■ The Uniform Commercial Code provides a more fundamental reason why Plaintiff–Trustee's attempt to recover under § 544 must fail. Even if the Court

were to find that Plaintiff–Trustee has stated good grounds to avoid the Assignments, recovery of the Notes would be impossible because Defendant holds the Notes as a holder in due course under the Uniform Commercial Code (the "U.C.C."). All three states involved in this proceeding have adopted the U.C.C.[4] Pursuant to U.C.C. § 3–302,[5] a holder in due course is defined as a holder who takes an instrument

(a) for value; and

(b) in good faith; and

(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

U.C.C. § 3–302(1). A holder in due course takes the instrument free from

(1) all claims to it on the part of any person; and

(2) all defenses of any party to the instrument with whom the holder has not dealt except

(a) infancy, to the extent that it is a defense to a simple contract; and

(b) such other incapacity, or duress, or illegality of the transaction, as renders the obligation of the party a nullity; and

(c) such misrepresentation as he has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms; and

(d) discharge in insolvency proceedings; and

(e) any other discharge of which the holder has notice when he takes the instrument.

U.C.C. § 3–305.[6] Therefore, as a holder in due course, Defendant is not susceptible to

---

**4.** For ease of discussion, the Court will use the general U.C.C. statutory numbers in the text and make reference to each state's particular code citations in footnotes. Effective January 1, 1993, Florida has adopted the 1990 Revision of Article 3. However, because the events giving rise to this proceeding occurred prior to January 1, 1993, the Court will apply the law previously in effect.

**5.** O.C.G.A. § 11–3–302; Fla.Stat.Ann. § 673.3–302; Ala.Code § 7–3–302.

**6.** O.C.G.A. § 11–3–305; Fla.Stat.Ann. § 673.3–305; Ala.Code § 7–3–305.

attempts by Plaintiff–Trustee to recover the Notes.

██ Plaintiff–Trustee contends that Defendant does not qualify as a holder in due course of the Notes. First, Plaintiff–Trustee suggests that, because Defendant took the Notes in the connection with the purchase of the Disputed Mortgages & Security Deeds, it is not entitled to holder in due course status. Plaintiff–Trustee's Brief in Support of Trustee's Motion for Summary Judgment and in Opposition to MLA's Cross–Motion for Summary Judgment filed October 7, 1992 at 24. However, U.C.C. § 3–112(1)(b)[7] provides that

> [t]he negotiability of an instrument is not affected by
>
> . . . . .
>
> (b) a statement that collateral has been given to secure obligations either on the instrument or otherwise of an obligor on the instrument or that in the case of default on those obligations the holder may realize on or dispose of the collateral.

Therefore, the negotiability of the Notes and Defendant's status as a holder in due course are not marred because the Notes are secured by the Disputed Mortgages and Security Deeds.

Plaintiff–Trustee also argues that Defendant does not qualify as a holder in due course because of U.C.C. § 3–119(1),[8] which provides that

> As between the obligor and his immediate obligee or any transferee the terms of an instrument may be modified or affected by any other written agreement executed as a part of the same transaction, except that a holder in due course is not affected by any limitation of his rights arising out of the separate written agreement if he had no notice of the limitation when he took the instrument.

Plaintiff–Trustee contends that U.C.C. § 3–119(1) results in finding that

MLA [Defendant herein] took subject to any side agreement or defenses that existed between MLA and the Debtor. In relation to side agreements and defenses between the Debtor and MLA, MLA's rights are not the same as a holder in due course. Thus, MLA cannot assert holder in due course status as to its transaction with the Debtor.

Plaintiff–Trustee's Brief in Support of Trustee's Motion for Summary Judgment and in Opposition to MLA's Cross–Motion for Summary Judgment filed October 7, 1992 at 25.

Plaintiff–Trustee's logic is difficult to follow here. U.C.C. § 3–119(1) speaks of the "obligor" and the "obligee and any transferee." It appears that Plaintiff–Trustee is assuming that the Debtor is the obligor and Defendant the obligee. It is clear that this section refers to the obligor of the note. Thus, U.C.C. § 3–119 simply states that, because Defendant was aware at the time it took the Notes that there were other written agreements (the Disputed Mortgages and Security Deeds) its rights in the Notes may be affected by those written agreements. This does not affect the negotiability of the Notes. "A separate agreement does not affect the negotiability of an instrument." U.C.C. § 3–119(2).

██ Plaintiff–Trustee also argues that Defendant cannot be a holder in due course because Defendant did not obtain all of the documents called for in the Purchase Agreement prior to authorizing payment to the Debtor. Plaintiff–Trustee relies upon the case of *United States v. Klatt*, 135 F.Supp. 648 (S.D.Cal.1955). In *Klatt*, a holder of a note whose transferor had failed to obtain a certain certificate prior to disbursement of loan proceeds was charged with knowledge of the forged signature on that certificate. The Court finds *Klatt* to be of little help to this proceeding. First,

---

**7.** O.C.G.A. § 11–3–112(1)(b) [Georgia has not adopted the official version of § 3–112(1)(b). In Georgia, that section provides that "[t]he negotiability of an instrument is not affected by: ... (b) A statement that collateral has been given for the instrument or in case of default on

the instrument the collateral may be sold."]; Fla.Stat.Ann. § 673.3–112(1)(b); Ala.Code § 7–3–112(1)(b).

**8.** O.C.G.A. § 11–3–119(1); Fla.Stat.Ann. § 673.3–119(1); Ala.Code § 7–3–119(1).

unlike Defendant herein, the holder in *Klatt* was not a holder in due course. Second, Plaintiff–Trustee has failed to allege any defects in the underlying transactions with the obligors on the Notes. *Klatt* does not stand for the proposition that failure to obtain a certain document is fatal to a holder of a Note where there is no defect in that document. Thus, the Court finds the holding in *Klatt* irrelevant to the issues presented here.

■ Plaintiff–Trustee next argues that the Notes themselves are not negotiable, and, therefore, Defendant cannot be a holder in due course. Plaintiff–Trustee's Brief in Support of Trustee's Motion for Summary Judgment and in Opposition to MLA's Cross–Motion for Summary Judgment filed October 7, 1992 at 26. Seventeen of the Notes contain the notation that

> This form is used in connection with security deeds [mortgages] insured under the one- to four-family provisions of the National Housing Act.

The remaining nine Notes contain the following notice:

> NOTICE: THIS LOAN IS NOT ASSUMABLE WITHOUT THE APPROVAL OF THE VETERANS ADMINISTRATION OR ITS AUTHORIZED AGENT.

Plaintiff–Trustee contends that inclusion of the above notations takes the Notes out of the Uniform Commercial Code's definition of a negotiable instrument, which includes the requirement that the instrument must "[c]ontain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation, or power given by the maker or drawer except as authorized by this article." U.C.C. § 3–104(1)(b) [9]

The Court finds that neither of the notations renders the Notes nonnegotiable. The mere reference that the Notes were made in connection with security deeds or mortgages under the National Housing Act does not violate U.C.C. § 3–104(1)(b). It

does not make the notes *subject* to the National Housing Act, and U.C.C. § 3–105(1) [10] specifically provides that an unconditional promise to pay is not made conditional if the instrument "(c) [r]efers to or states that it arises out of a separate agreement or refers to a separate agreement for rights as to prepayment or acceleration; or ... (e) [s]tates that it is secured, whether by mortgage, reservation of title or otherwise."

■ The notice in the other Notes that they are not assumable without the approval of the Veterans Administration does not make conditional the maker's promise to pay. Plaintiff–Trustee's reliance on the case of *Geiger Fin. Co. v. Graham*, 123 Ga.App. 771, 182 S.E.2d 521 (1971) is not persuasive. In *Geiger Fin.*, the court had before it a document entitled "Retail Instalment Contract/Including Promissory Note and Security Agreement" which required a cash payment of $250.00 with a balance of $300.00 to be paid in 18 monthly installments. The issue to be decided was whether the document, which was made in the course of a consumer transaction, was a negotiable instrument. One of the many factors cited by the court for its finding that the document was not a negotiable instrument was that the consumer's obligation was nontransferable without the holder's consent. The court stated:

> Among other things, it grants to the holder powers to waive particular defaults or remedies without waiving others; and to require its written consent for any transfer of the buyer's obligations (while keeping it own freely transferable). It also contains an application for insurance (in effect a grant of authority to the holder to purchase it) and an agreement that the terms of the contract may apply to subsequent sales. It contains a purported waiver by the buyer of "any defense, counterclaim or cross-complaint" he could have asserted against the seller. This goes further

---

**9.** O.C.G.A. § 11–3–104(1)(b); Fla.Stat.Ann. § 673.3–104(1); Ala.Code § 7–3–104(1)(b).

**10.** O.C.G.A. § 11–3–105(1)(c) and (e) [O.C.G.A. § 11–3–105(1)(c) simply reads "[r]efers to or

states that it arises out of a separate agreement;"]; Fla.Stat.Ann. § 673.3–105(1)(c); Ala. Code § 7–3–105(1)(c).

than reiterating the rights of a holder in due course since "any defense" would also presumably include infancy, incompetence, discharge in bankruptcy, etc. This is not the type of waiver contemplated by Code. Ann. § 109A–3–112. Rather, it is an attempt to impart the effect of negotiability to a writing which cannot otherwise meet the test of an Article 3 negotiable instrument.

123 Ga.App. at 774, 182 S.E.2d 521. Clearly, nonassumability was only one factor used by the court to demonstrate the overbearing and onesidedness of this transaction. The court did not find that, standing alone, a notice that an obligation is nonassumable without the consent of an entity such as the Veterans Administration renders a note nonnegotiable pursuant to U.C.C. § 3–104(1)(b). Furthermore, a limitation on the assumability of an obligation does not qualify a maker's obligation to pay. Therefore, the Court finds that the Notes are negotiable instruments within the meaning of U.C.C. § 3–104 and that Defendant qualifies under U.C.C. § 3–302 as a holder in due course of the Notes.

 Plaintiff–Trustee argues that the transaction between the Debtor and Defendant transferring the Notes and Disputed Mortgages and Security Deeds must be looked upon as a real property transaction and that state recording laws must prevail. MLA was not simply taking commercial paper from the Debtor, it was purchasing, by assignment, mortgages and security deeds. The Purchase Agreement specifically provides that MLA "accepted [the Debtor's] offer to sell and agreed to purchase from [the Debtor], by assignment, FHA insured and/or VA guaranteed mortgages ..." Furthermore, in connection with the transfers, the Debtor executed documents titled "Assignment of Mortgage." These assignments provide that the Debtor granted, bargained, sold, conveyed, assigned and delivered to MLA the individual mortgages, together with the debt secured, and all the interests in the land and property conveyed by the security instruments. Thus, MLA

is merely an assignee, and assignees do not take free and clear of any and all claims or defenses that might be asserted against the assignor. MLA's argument that it is a holder in due course of the note ignores the fact that the Debtor assigned the mortgages and security deeds to MLA via a separate instrument. Plaintiff–Trustee's Brief in Support of Trustee's Motion for Summary Judgment and in Opposition to MLA's Cross–Motion for Summary Judgment filed October 7, 1992 at 24–25. Accepting Plaintiff–Trustee's "holistic" approach would require ignoring the negotiable character of the Notes. Plaintiff–Trustee has failed to cite any authority for disregarding the Uniform Commercial Code where, as here, negotiable instruments have been transferred by negotiation. *See* U.C.C. § 3–202.[11] In *Capital Investors Co. v. Executors of Estate of Morrison,* 484 F.2d 1157 (4th Cir. 1973), the Fourth Circuit Court of Appeals stated

The notes in dispute are negotiable instruments and the transferability of such notes, as well as the rights flowing from such transfers, are to be determined by the legal principles unique to negotiable instruments. This is so, though the notes are secured by a real estate mortgage.

484 F.2d at 1160 (footnote omitted). This Court cannot ignore the Uniform Commercial Code and the national interest in keeping commercial paper flowing. The result urged by Plaintiff–Trustee is totally unacceptable in the world of commercial paper. The Court will not set aside the transfer of the Notes, for to do so would destroy their negotiability and call into question all notes negotiated in connection with the secondary mortgage market. Furthermore, setting aside only the Disputed Mortgages and Security Deeds would render no benefit to the bankruptcy estate. Without the Notes, the Disputed Mortgages and Security Deeds are unenforceable. Thus, there being no material facts in dispute, the Court will grant summary judgment in favor of Defendant on the Section 544 Count.

---

**11.** O.C.G.A. § 11–3–202; Fla.Stat.Ann. § 673.3– 202; Ala.Code § 7–3–202.

## II. Defendant's Counterclaim

Defendant has filed a counterclaim against Plaintiff–Trustee seeking the return of certain monies received by Plaintiff–Trustee from the United States Department of Housing and Urban Development ("HUD") and reimbursement for certain late fees incurred by Defendant in connection with the purchase of mortgage insurance with HUD.

### A. Undisputed Facts

The Purchase Agreement required that mortgage insurance be obtained on each loan purchased from the Debtor. As to each of the 18 mortgages and security deeds in question, the settlement agent received funds from the borrower for the payment of a one time mortgage insurance premium (the "Mortgage Insurance Premium") in order to obtain mortgage insurance from HUD. At the closing of each of the loans in question, the settlement agent paid the borrower's Mortgage Insurance Premium to HUD as represented in the HUD–1 Settlement Statement with respect to each loan. Postpetition, Plaintiff–Trustee demanded HUD turn over the Mortgage Insurance Premiums related to the 18 mortgages and security deeds. *See* Exhibit B attached to Defendant's Statement of Material Facts Not in Dispute. HUD complied with Plaintiff–Trustee's demand. Defendant was then required to expend $45,556.36 in premiums and $1,822.24 in late fees to replace the mortgage insurance with HUD. Defendant seeks to recover both the $45,556.36 amount for the premiums as well as the $1,822.24 for late fees.

### B. Conclusions of Law

 The Court finds that, at the time the Debtor's bankruptcy case was commenced, the Debtor had no interest in the Mortgage Insurance Premiums held by HUD. Pursuant to § 541(d) of the Bankruptcy Code, Plaintiff–Trustee only succeeded to the interest the Debtor had in the Mortgage Insurance Premiums on the date the bankruptcy case was commenced. Although HUD may have held them in an account designated as the Debtor's, the Debtor certainly had no equitable interest in those Mortgage Insurance Premiums.

The Debtor had already sold the loans relating to the Mortgage Insurance Premiums prior to bankruptcy. Therefore, the Court finds that Plaintiff–Trustee holds those funds in trust for Defendant.

 Defendant is also entitled to recover the amount of late fees it was required to pay to HUD as its damages for being denied access to the Mortgage Insurance Premiums which were clearly part of the loan packages it purchased from the Debtor. As the Mortgage Insurance Premiums were transferred from HUD to Plaintiff–Trustee postpetition, Defendant's claim for late fees in the amount of $1,822.24 is entitled to administrative expense status and must be paid on par with all other administrative expense claims. There being no material facts in dispute, Defendant is entitled to summary judgment on Defendant's counterclaim.

## II. The Preference Count

The Court will now consider the Parties' cross-motions for summary judgment on the Preference Count of the Complaint in which Plaintiff–Trustee seeks to avoid as preferential transfers pursuant to § 547 of the Bankruptcy Code certain sums received by Defendant from the Debtor for the repurchase of three mortgages. Defendant initially argues that the Court should not consider Plaintiff–Trustee's cross-motion because it was filed more than 20 days after the expiration of discovery in violation of LR 220–5(c), N.D.Ga. Defendant cites *Dedge v. Kendrick*, 849 F.2d 1398 (11th Cir.1988) as authority for this proposition. In *Dedge*, the Eleventh Circuit Court of Appeals affirmed the district court's denial of a motion for summary judgment filed after the expiration of discovery. The Court finds *Dedge* inapplicable to the proceedings *sub judice*, however, because Defendant seeks disallowance of a *cross*-motion which was filed in response to Defendant's motion for summary judgment. Even if the Court refused to consider Plaintiff–Trustee's cross-motion, the Court must still consider Defendant's motion. Since Defendant's motion and Plaintiff–Trustee's cross-motion raise virtually

identical questions of law and fact, the Court concludes that they should be considered together. Accordingly, the Court will consider Plaintiff–Trustee's cross-motion.

### A. Undisputed Facts [12]

On or about May 27, 1988, the Debtor entered into a purchase agreement (the "Purchase Agreement") with Defendant in which Defendant agreed to purchase certain loans from the Debtor. Each loan was represented by a promissory note and was to be secured by a first priority lien on certain residential real property. The Purchase Agreement required the Debtor to repurchase a loan from MLA under certain circumstances defined in the Purchase Agreement. Purchase Agreement, ¶¶ 6, 8, 9, attached as Exhibit A to the Supplemental Affidavit of Paul F. Geyer filed January 28, 1993 ("Geyer Supplemental Affidavit"). These circumstances included where the loan was placed into foreclosure within 90 days of purchase. The Debtor also agreed to repurchase any loans secured by real property located in Dade County, Florida.

Defendant required the Debtor to repurchase three Loans (the "Loan Repurchases") during March 1989. The Debtor repurchased each loan by issuing a check to Defendant in exchange for the respective note and security documents. The following chart illustrates these transactions:

| Check No. | Amount of Check | Delivery Date | Obligor on Note |
|---|---|---|---|
| 2588 | $71,055.57 | 3/07/89 | Lumbus |
| 2596 | $75,428.25 | 3/09/89 | Ford |
| 2657 | $57,039.32 | 3/28/89 | Wright |

On May 4, 1989, several of the Debtor's creditors filed an involuntary petition against the Debtor. The Debtor converted the involuntary Chapter 7 case to a case under Chapter 11 on May 16, 1989. Subsequently, the case was reconverted to a Chapter 7 case on June 8, 1989, and Plaintiff–Trustee was appointed Chapter 7 trustee of the Debtor's bankruptcy estate. Plaintiff–Trustee now seeks to recover the transfers above as preferential payments to Defendant.

### B. Conclusions of Law

■■■ Defendant contends that the Loan Repurchases were not preferential transfers. Defendant contends, in the alternative, that even if the Court finds that the Loan Repurchases were preferences, the Plaintiff–Trustee may not avoid them because they are subject to the new value, contemporaneous exchange, and ordinary course of business exceptions of § 547(c).

#### 1. Section 547(b)

Pursuant to § 547(b) of the Bankruptcy Code, a trustee may avoid

... any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition;

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). Defendant concedes that the Loan Repurchases were transfers to Defendant for its benefit. Further, it is undisputed that all the repurchases oc-

---

**12.** Some of the undisputed facts have been recited in part IA of this Memorandum. However, for the convenience of the reader, they are repeated here.

curred within ninety days of the filing of the involuntary petition against the Debtor and, pursuant to § 547(f), the Debtor is presumed to have been insolvent during this period.[13] Defendant argues, however, that the transfers fail to meet the requirements of § 547(b)(2) and (5) because they were not on account of an antecedent debt and did not enable Defendant to receive more than it would have received in a Chapter 7 liquidation.

Defendant contends that only the repayment of credit is considered "for or on account of an antecedent debt" and that, because the Loan Repurchases involved reconveyance of a note and accompanying security documents to the Debtor for each loan repurchased, no debt from the Debtor to Defendant ever arose. The Court does not agree. The Bankruptcy Code defines a debt as "liability on a claim." § 101(12). A "claim" is defined very broadly as a

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

§ 101(5). Under the Purchase Agreement, Defendant had a right to require the Debtor to repurchase a loan upon the occurrence of certain events. When these events occurred, a debt from the Debtor to Defendant arose. The fact that Defendant's right to repayment was contingent upon its reconveyance of the note and security documents to the Debtor is immaterial.

Defendant also argues that the Debtor's contractual obligation to repurchase the loans was a right of rescission and was, therefore, not an antecedent debt. In support of its argument, Defendant cites *Lewis v. Diethorn*, 893 F.2d 648 (3rd Cir.1990),

*cert. denied*, 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 332 (1990). In *Lewis*, the Third Circuit Court of Appeals held that the debtor's payment in settlement of a law suit within ninety days of filing bankruptcy was not a preference because the claim held by the transferee against the debtor was not an antecedent debt. *Id.* at 650. The court opined that the debtor did not receive " . . . freedom from liability on an antecedent debt, but freedom from the risk of litigation . . ." and the removal of a lis pendens that the creditor had placed on a parcel of the debtor's real property. *Id.* However, the court also based its holding on two other alternate grounds. First, the court concluded that the settlement fell within the contemporaneous exchange exception to the trustee's § 547(b) avoidance power. Second, the court found that, under applicable state law, the creditor had the right to assert an equitable lien against the debtor's real property which would have rendered his claim secured. *Id.* Accordingly, the requirement in § 547(b)(5) that the transfer enable the transferee to receive more than he would have received in a Chapter 7 liquidation was not satisfied. *Id.* The Court finds that these alternate grounds for decision significantly weaken the persuasive value of *Lewis* on the point for which it was cited. The Court, therefore, declines to apply it to this proceeding. In addition, the Court notes that the term "claim" includes a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment. . . ." § 101(5)(B). Defendant has characterized the Loan Repurchases as a right of rescission entitling Defendant to repayment of the purchase price. Therefore, based on the undisputed material facts in this proceeding the Court concludes as a matter of law that the contractual right to require the Debtor to repurchase the loans was an antecedent debt.

Defendant asserts, in the alternative, that the Loan Repurchases were not preferences because they did not satisfy the requirements of § 547(b)(5) that the transfer enable the creditor to receive more than it would have received in a Chapter 7 liqui-

---

**13.** Section 547(f) merely raises a presumption of insolvency which may be rebutted by con-

trary evidence. However, Defendant has not presented any contrary evidence on this issue.

dation if the transfers had not occurred. In order to resolve this issue the Court will compare the price that the Debtor paid Defendant for the repurchase of the loans to the amount that Defendant would have received by enforcing its rights under the loan documents had it retained the loans.

Defendant received $203,523.14 as a result of the Loan Repurchases. However, the parties dispute the value of the three loans. In his affidavit, Plaintiff–Trustee stated that shortly after repurchasing the Ford and Lumbus Loans, the Debtor sold them both to Sovereign Mortgage Corporation for $85,000. Plaintiff–Trustee's Affidavit filed January 14, 1993, ¶ 3 ("Plaintiff–Trustee's Affidavit"). Attached to Plaintiff–Trustee's Affidavit is a check for $70,000 issued to Ascot Mortgage, Inc. and a check for $15,000 issued to Adams Realty. The Trustee states that these two checks represent the entire purchase price for the Ford and Lumbus Loans and accurately reflect their combined value. Plaintiff–Trustee also states that after repurchasing the Wright Loan, the Debtor transferred it to Florida Group, Inc. who transferred it back to the Debtor a short time later. The Debtor then transferred the Wright Loan to Nationwide Mortgage Corp. ("Nationwide") on April 19, 1989. Plaintiff–Trustee has been unable to determine the consideration paid by Nationwide for the Wright Loan. Plaintiff–Trustee's Affidavit ¶ 4.

Defendant asserts that the price the Debtor obtained for the Ford and Lumbus Loans does not accurately reflect their value. In addition, Paul F. Geyer, President of Defendant, stated in his Affidavit that the Ford and Lumbus Loans were insured by mortgage insurance certificates under the United States Department of Housing and Urban Development's ("HUD") mortgage insurance program and that the loans had an insured value of $70,471.99 and $67,069.23, respectively. Geyer Supple-mental Affidavit ¶ 10. Geyer stated that if the Debtor had failed to repurchase the Ford and Lumbus Loans, Defendant would have expected to recover these amounts, less $2,500 on each Loan for interest and foreclosure expenses that were not reimbursable. *Id.*

Defendant purchased the Wright Loan on March 22, 1989 for $57,039.32 and, upon finding that it was secured by residential real estate in Dade County Florida, requested that the Debtor repurchase the loan. The Debtor repurchased it on March 28, 1989. As stated previously, Plaintiff–Trustee has been unable to determine the consideration paid by Nationwide for the Wright Loan. Plaintiff–Trustee's Affidavit ¶ 4. However, in his Reply Brief, Plaintiff–Trustee concedes that the repurchase price of $57,039.32 represented the value of the Wright Loan. Reply Brief in support of Plaintiff's Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment at 7.

 As previously stated, Defendant received $203,523.14 as a result of the Loan repurchases. Even if Defendant was able to prove that the values of the Ford and Lumbus Loans were the insured amounts of $70,471.99 and $67,069.23, respectively, and with the value of the Wright Loan of $57,039.32 added in, Defendant would still hold an unsecured claim for well over $13,000.00 had the transfers not occurred.[14] Plaintiff–Trustee has stated that unsecured claims will not be paid in full, and Defendant has not controverted this testimony. Plaintiff–Trustee's Affidavit ¶ 2. Accordingly, the Court finds that as a matter of undisputed fact the Loan Repurchases enabled Defendant to receive more than it would have received if this case were under Chapter 7 and the transfers had not been made. Therefore, the Court finds that as a matter of law the Loan Repurchases were preferential transfers.[15]

### 2. Section 547(c)

#### a) New Value Exception of § 547(c)(4)

 This conclusion does not end the Court's inquiry, however. Defendant

---

**14.** This amount calculated as follows: $203,-523.14 − ((70,471.99 + 67,069.23 + 57,039.32) − $5,000.00 [collection costs]) = $13,942.60.

**15.** It should be noted that § 547(b) allows a trustee to set aside the entire transfer even though, as here, the amount the creditor is preferred is small in relation to the amount of the transfer.

asserts that even if the Loan Repurchases were preferential transfers, these transfers are subject to certain exceptions to avoidance contained in § 547(c). First, Defendant contends that the new value exception of § 547(c)(4) bars Plaintiff–Trustee from any recovery under § 547(b). Defendant alleges that subsequent to the Loan Repurchases at issue, it purchased fifteen other loans from the Debtor, which the Debtor represented as being secured by first priority real estate liens. These loans were actually secured by second priority liens. Defendant contends that the aggregate amount of the unsatisfied pre-existing liens of $530,265.50 constituted new value to the Debtor, and pursuant to § 547(c)(4), Defendant seeks to set off the preferential Loan Repurchases with this amount of new value. Section 547(c)(4), provides that:

> [t]he trustee may not avoid under this section a transfer—
>
> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
>
> > (A) not secured by an otherwise unavoidable security interest; and
> >
> > (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

In order to establish that a transfer qualifies for treatment as new value, the creditor must prove (1) that the creditor extended the new value after receiving the challenged payments, (2) that the new value was unsecured, and (3) that the new value remained unpaid. *Charisma Inv. Co. v. Airport Systems, Inc. (In re Jet Fla. System, Inc.)*, 841 F.2d 1082 (11th Cir.1988) (citations omitted). The creditor bears the burden of proving this and all other § 547(c) defenses. § 547(g).

Plaintiff–Trustee acknowledges that the Debtor apparently breached the Purchase Agreement by not paying off pre-existing liens on some of the loans it sold to Defendant after the Loan Repurchases occurred. Plaintiff–Trustee asserts, however, that the new value exception was intended to apply only to extensions of credit and not to a transaction that had the unintended effect of creating a windfall for the Debtor. The Court does not agree. The cases interpreting the new value exception focus on whether the new value had the effect of replenishing the estate by restoring the value removed from the estate by the preference. *Kroh Brothers Dev. Co. v. Continental Constr. Eng'r, Inc. (In re Kroh Brothers Dev. Co.)*, 930 F.2d 648, 652 (8th Cir.1991); *Erman v. Armco, Inc. (In re Formed Tubes, Inc.)*, 46 B.R. 645, 647 (Bankr.E.D.Mich.1985). A creditor's motives in extending new value and the form of the new value appear to be irrelevant as long as the subsequent transfer had the effect of restoring value to the estate. The Court concludes that, to the extent Defendant can establish that, subsequent to the alleged preferences, the Debtor received unencumbered cash payments from Defendant in excess of property transferred to Defendant, Defendant is entitled to prevent Plaintiff–Trustee from recovering under § 547(b).

Plaintiff–Trustee argues that Defendant has failed to produce any evidence to show the amount of new value advanced. The following reflects the transactions in question.

| Borrower | Purchase Date | Price Paid | Pre–Existing Lien |
|---|---|---|---|
| Card | 3/7/89 | $36,212.49 | $31,122.11 |
| Moir | 3/9/89 | $50,279.28 | $46,230.98 |
| White | 3/14/89 | $37,970.84 | $35,456.11 |
| Parker | 3/14/89 | $31,920.80 | $29,375.85 |
| Graper | 3/16/89 | $45,327.66 | $42,810.01 |
| Slaughter | 3/17/89 | $41,305.30 | $38,068.50 |
| Purdy | 3/20/89 | $41,959.30 | $39,339.95 |
| Billingsley | 3/24/89 | $45,670.31 | $44,338.95 |
| Andrews | 3/24/89 | $30,481.16 | $27,847.72 |
| Davis | 3/27/89 | $29,246.20 | $27,215.92 |
| Kammar | 3/27/89 | $39,661.35 | $36,992.25 |
| Miller | 3/30/89 | $34,565.33 | $32,026.40 |
| Fellows | 3/30/89 | $35,399.18 | $32,317.02 |
| Porter | 4/4/89 | $34,666.55 | $32,643.43 |
| Schlegal | 4/7/89 | $37,428.00 | $34,471.30 |

Geyer Affidavit ¶ 12. Geyer stated in his Affidavit that Defendant subsequently paid all unsatisfied liens on these properties and that Defendant has not been reimbursed for these payments. *Id.* ¶ 13. This evidence indicates that the purchases consummated by Defendant after receipt of the alleged preferential transfers restored to the Debtor value greater than the Debtor lost as a result of the preferences. Plaintiff–Trustee does not dispute the above figures. Instead, he contends that the amount of new value received by the Debtor is to be calculated by "the difference between the purchase price paid by MLA and the value of the loans purchased." Reply Brief in Support of Plaintiff's Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment at 11. According to Plaintiff–Trustee, Defendant has failed to establish the value of the loans purchased, therefore, summary judgment is precluded. *Id.*

It is unclear to the Court what Plaintiff–Trustee is arguing.[16] Unless Plaintiff–Trustee is contending that the Debtor had no obligation to pay off the pre-existing encumbrances in full, the value which the Court must determine is the amount the Debtor was enhanced by its failure to pay off those encumbrances. This is a simple mathematical exercise. The sum of the pre-existing liens is the extent to which the Debtor received new value; to wit: $530,256.50. This quite easily offsets the amount of the preference, which the Court has previously found to be $203,523.14.

The Court recognizes that the facts presented in this proceeding do not conform to the context in which one usually sees the new value exception of § 547(c)(4) applied. It is not one where a creditor deals with a

debtor on an open account by extending new credit. Plaintiff–Trustee argues that, because Defendant did not extend credit to the Debtor, the new value exception is not applicable. However, "new value" is defined more broadly than simply the extension of unsecured credit. Section 547(a)(2) defines "new value" as

> money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

§ 547(a)(2). Here, the Debtor received unencumbered cash in the amount of $530,265.50. Accordingly, the Court finds that Defendant has met its burden of proving the lack of a dispute of material fact and its right to judgment as a matter of law on all the issues raised by § 547(c)(4).

This should end the Court's inquiry. However, Defendant has raised other defenses to Plaintiff–Trustee's attempt to recover the three preferential transfers. The Court will consider those defenses now for the sake of judicial economy. In the event a trial must be held at a later date on the Preference Count of the Complaint, the issues on the other defenses will be narrowed by the Court's consideration of them today.

### b) Contemporaneous Exchange Exception of § 547(c)(1)

■ Defendant also argues that, with the exception of $5,000, the allegedly preferential transfers are not subject to avoidance because they were contemporaneous exchanges for new value under § 547(c)(1). Defendant's Memorandum in Support of its Motion for Summary Judgment on Trustee's Complaint to Set Aside Preference at 15. Section 547(c)(1) provides that:

---

**16.** Plaintiff–Trustee's formula above might be relevant if this were an action to set aside a fraudulent conveyance. The purchase price and the actual value of the loans repurchased would then be relevant. However, Plaintiff–Trustee has made no allegations that a fraudulent transfer is involved here.

[t]he trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange.

The Eleventh Circuit Court of Appeals requires a creditor to prove three elements in order to establish this defense: "(1) the transferee must have extended new value to the debtor in exchange for the payment or transfer, (2) the exchange of payment for new value must have been intended by the debtor and transferee to be contemporaneous, and (3) the exchange must have been in fact substantially contemporaneous." *Official Unsecured Creditors' Comm. v. Airport Aviation Serv., Inc. (In re Arrow Air, Inc.)*, 940 F.2d 1463 (11th Cir.1991). The Court will determine whether a dispute of fact exists with regard to these three elements.

The creditor must extend new value to the debtor in exchange for the transfer. The Eleventh Circuit Court of Appeals has held that this defense prevents the avoidance of a transfer only to the extent of the value conveyed to the debtor by the creditor. *Jet Florida, Inc. v. American Airlines, Inc. (In re Jet Florida Systems, Inc.)*, 861 F.2d 1555, 1558 (11th Cir.1988). As stated previously, Plaintiff–Trustee concedes in his Reply Brief that the repurchase price of $57,039.32 represented the value of the Wright Loan. Reply Brief in support of Plaintiff's Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment at 7. Therefore, as to the preferential transfer received by Defendant in connection with the Wright Loan, the full amount received by Defendant is protected under § 547(c)(1) from recovery by Plaintiff–Trustee if Defendant can establish the other two requirements of that subsection. As to the

Ford and Lumbus Loans, the Court has previously concluded that a dispute of fact exists as to the value of these loans. *See supra* p. 1018. Accordingly, summary judgment on this element as to the Ford and Lumbus Loans is inappropriate.

Defendant must also establish that 1) Defendant and the Debtor intended the exchanges to be contemporaneous, and 2) the exchange were in fact substantially contemporaneous. Paul Geyer stated in his Affidavit that the Debtor and Defendant intended the exchanges involved in the three Loan Repurchases to be contemporaneous. Geyer Affidavit ¶¶ 6, 9. Plaintiff–Trustee has not provided any evidence to dispute this assertion. Accordingly, the Court finds that it is undisputed that Defendant and the Debtor intended that the transfers in question be contemporaneous.

The evidence also shows that exchanges were in fact substantially contemporaneous. Geyer stated that the Debtor delivered a check to Defendant for the repurchase of the Lumbus Loan on or about March 7, 1989, delivered a check to Defendant on or about March 9, 1989 for the repurchase of the Ford Loan, and delivered a check to Defendant on or about March 28, 1989 for the repurchase of the Wright Loan. Geyer Affidavit ¶¶ 5, 8. Geyer further stated that, immediately upon receipt of these checks, Defendant endorsed and delivered to the Debtor the promissory notes and security documents for the loans. Geyer Affidavit at ¶¶ 6, 9. In his Supplemental Affidavit, Geyer stated that at most two or three days elapsed between Defendant's receipt of the check for the repurchase of each loan and the Debtor's receipt of the loan documents. Geyer Supplemental Affidavit ¶ 5. The courts considering this element have concluded that contemporaneity is to be determined with reference to the type of transaction at issue. *Tyler v. Swiss Am. Sec., Inc. (In re Lewellyn & Co., Inc.)*, 929 F.2d 424, 427 (8th Cir.1991) (citing *Creditors' Committee v. Spada (In re Spada)*, 903 F.2d 971, 975 (3d Cir.1990)). Plaintiff–Trustee has not provided any evi-

dence to dispute that the transfers were not in fact contemporaneous. The Court finds that the elapse of only two or three days between Defendant's receipt of the repurchase price and the transfer back of the loans establishes the repurchases were in fact substantially contemporaneous.

Accordingly, the Court will grant summary judgment in favor of Defendant on this issue. If this proceeding comes to trial and the necessity arises, Defendant will be given the opportunity to demonstrate the value of the Ford and Lumbus Loans.[17] The Court further finds that, as to the Wright Loan, Defendant has established all three elements. Therefore, the granting of summary judgment in favor of Defendant on the Wright Loan is appropriate.

### c) Ordinary Course of Business Exception of Section 547(c)(2)

Finally, Defendant argues that the repurchases were transfers made in the ordinary course of the business of Defendant and the Debtor and, therefore, pursuant to § 547(c)(2), may not be avoided. Section 547(c)(2) provides that

[t]he trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

As with the other § 547(c) defenses, Defendant bears the burden of proving these three elements. § 547(g).

Subparagraph (A) requires the debt to be common to the business of both the debtor and creditor. *Finley v. Mr. T's Apparel, Inc.* (*In re Washington Mfg. Co.*), 144 B.R. 376, 378 (Bankr.M.D.Tenn.1992). Under subparagraph (B), the repayment must be ordinary to the business relations of the debtor and the creditor. *Logan v. Basic Distribution Corp.* (*In re Fred Hawes Org., Inc.*), 957 F.2d 239, 244 (6th Cir.1992). Finally, subparagraph (C) requires proof that, under the standards of the industry in which the debtor and creditor are engaged, the payment is ordinary. *Id.* The Court will examine the evidence presented and determine whether Defendant or Plaintiff–Trustee has established its right to summary judgment on these issues.

The Debtor and Defendant entered into the Purchase Agreement on or about May 27, 1988. This agreement provided that, upon the occurrence of certain events and Defendant's insistence, the Debtor would be obligated to repurchase a loan from Defendant. Geyer stated in his Affidavit that the Ford, Lumbus, and Wright Loans were repurchased by the Debtor pursuant to the Purchase Agreement. Geyer Affidavit ¶¶ 5, 8; Geyer Supplemental Affidavit ¶ 4. This stands undisputed in the record. Accordingly, the Court concludes

---

17. Plaintiff–Trustee asserts that the value of the Ford and Lumbus Loans should be set at $85,-000. This is the amount the Debtor received when it sold the loans to Sovereign Mortgage Corporation shortly after repurchasing them from Defendant. Defendant, on the other hand, contends that the true value of the Ford and Lumbus Loans should be determined to be much higher because mortgage insurance covered both loans. Defendant asserts that the true values of the Ford and Lumbus Loans should be, at a minimum, $70,471.99 and $67,069.23,

respectively. Reply Brief in Support of Defendant's Motion for Summary Judgment on Trustee's Complaint to Set Aside Preference at 10–11. Although the Court is making no final ruling on the values of the Ford and Lumbus Loans today, it appears that the existence of mortgage insurance must be reflected in valuing these loans. The amounts which the Debtor obtained in selling these loans will have to be examined very closely and may be of little probative value. On the facts currently before the Court, it appears that Defendant's position is clearly more supportable than that of Plaintiff–Trustee.

that all three Loan Repurchases were consummated pursuant to the Purchase Agreement that governed the rights of the Debtor and Defendant and that, therefore, the obligations to repurchase were incurred and the repurchases were effected in the ordinary course of business of the Debtor and Defendant. The Court concludes, therefore, that Defendant has established the lack of a dispute of material fact and its right to summary judgment on subparagraphs (A) and (B) of § 547(c)(2).

Defendant must still demonstrate that these repurchases were ordinary compared to similar transactions in the secondary mortgage market. Geyer has stated in his affidavit that the provisions governing repurchases in the Purchase Agreement were typical of provisions generally found in secondary mortgage market purchase agreements. Geyer Affidavit ¶ 4. Plaintiff–Trustee has not submitted any testimony to contradict this evidence. However, the Court finds that this statement, even though undisputed, is insufficient to warrant granting summary judgment to Defendant on this issue. While Geyer stated that he had twenty-two years of experience in the mortgage banking industry and should therefore be considered an expert on this issue, Geyer Affidavit ¶ 2, the Court finds that, as President of Defendant, his testimony is too self-serving to grant summary judgment to Defendant on this issue. *See Fred Hawes Org., Inc.*, 957 F.2d at 244–46; *Washington Mfg. Co*, 144 B.R. at 376. Accordingly, the Court will not grant summary judgment to Defendant on this issue.

In summary, the Court has concluded that summary judgment will be granted in favor of Plaintiff–Trustee on all issues raised by section 547(b) and the three Loan Repurchases are determined as a matter of law to be preferences. The Court has further concluded that summary judgment will be granted in favor of Defendant on all issues raised by section 547(c)(4), and the three preferential transfers are determined as a matter of law to be subject to the new value exception of § 547(c)(4). Additionally, the Court has found that Defendant has established that the transfer in connection with the Wright Loan comes within the contemporaneous exchange exception of § 547(c)(1). Finally, the Court concludes that there are disputes of material facts with regard to the applicability of the contemporaneous exchange exception as it pertains to the Ford and Lumbus Loans as well as the applicability of the ordinary course of business exception to all three of the loans. Therefore, summary judgment will be denied as to these exceptions.

## *ORDER*

In accordance with the reasoning above, **IT IS THE ORDER OF THE COURT** that

1. Plaintiff–Trustee's Motion to File Supplemental Brief be, and the same hereby is, **GRANTED;**

2. Plaintiff–Trustee's Motion for Summary Judgment on the Section 544 Count of the Complaint be, and the same hereby is, **DENIED;**

3. Defendant's Cross–Motion for Summary Judgment on the Section 544 Count of the Complaint be, and the same hereby is, **GRANTED;**

4. Defendant's Cross–Motion for Summary Judgment on Defendant's Counterclaim be, and the same hereby is, **GRANTED;**

5. Plaintiff–Trustee's Cross–Motion for Summary Judgment on the Preference Count be, and the same hereby is, **GRANTED** to the extent that Plaintiff–Trustee has established all elements of a preference pursuant to § 547(b);

6. Defendant's Motion for Summary Judgment on the Preference Count be, and the same hereby is, **GRANTED** as to

a) all elements of the new value exception of § 547(c)(4) as it pertains to the Ford, Lumbus, and Wright Loans;

b) all elements of the contemporaneous exchange exception of § 547(c)(1) as it pertains to the Wright Loan and all elements except the amount of new value as it pertains to the Ford and Lumbus Loans; and

c) as to all elements of the ordinary course of business exception of § 547(c)(2), except subsection § 547(c)(2)(C) as it pertains to the Ford, Lumbus, and Wright Loans.

The Objection to Proof of Claim Count and Recovery of Payment Count of the Complaint remain pending.

An appropriate Judgment is entered contemporaneously herewith.

The Clerk is hereby **directed** to serve a copy of this Order on the Debtor, Debtor's attorney, the attorney for Plaintiff–Trustee, and the attorney for Defendant.

**IT IS SO ORDERED.**