Argued and submitted July 21, affirmed September 8, 1982

ADAIR HOMES, INC.,
*Respondent,*
*v.*
JARRELL et ux,
*Appellants.*

(No. 40-370, CA A22492)

650 P2d 180

David J. Jack, Hillsboro, argued the cause for appellants. With him on the brief was Garland, Karpstein & Verhulst, Hillsboro.

Thomas A. Huffman, Hillsboro, waived appearance for respondent.

Before Gillette, Presiding Judge, and Warden and Young, Judges.

WARDEN, J.

## WARDEN, J.

Plaintiff brought this action to recover lost profits and expenses caused by defendants' breach of contract. Plaintiff was awarded $7,807 in a trial to the court, and defendants appeal. We affirm.

Plaintiff is a corporation that constructs houses for sale, on the basis of pre-established sets of plans or models. Defendant[1] is an insurance agent in Hillsboro. In August, 1979, defendant contacted plaintiff's sales representative regarding the construction of a new office building for his insurance business on land that he owned in Hillsboro. He and the representative held a series of meetings in which they modified plans for one of plaintiff's house models to meet defendant's business needs. By September 24, they had agreed in general on the structure of the building, and a contract was executed by defendant and a representative of plaintiff at defendant's home.

The contract specified a total price for the job, which was calculated by adding to the standard price of the house model the additional labor and material costs of the planned alterations; the intention was to preserve plaintiff's profit margin on the basic model. Both parties understood, however, that additional changes would be made in the price and probably in the specifications. Specifically, defendant was to receive a price credit, because certain standard items for the model, such as a bathtub and kitchen fixtures, would not be installed in his building. The parties further understood that additional changes in the structure might be necessary in order to comply with the Hillsboro Commercial Building Code and that those changes would further affect the price. The agreement was qualified in one other respect: the contract price, as then determined, was subject to the approval of plaintiff's president (Marsh). The contract provided that defendant was to prepare the building site for construction.

On September 27, Marsh sent defendant a revised plan, which reflected other changes defendant had requested, and a letter requesting clarification as to certain

---

[1] Kenneth and LaJuanna Jarrell were sued, and judgment was entered against them, jointly and severely, as husband and wife; however it was Kenneth Jarrell with whom plaintiff dealt throughout this transaction.

of defendant's requirements. The letter also stated: "AS PREVIOUSLY DISCUSSED AND AGREED, ANY ADDITIONAL EXPENSE WE ENCOUNTER WHICH WOULD NOT BE REQUIRED IN NORMAL RESIDENTIAL CONSTRUCTION WILL BE AN EXTRA." On October 2, Marsh approved and signed the September 24 contract; he mailed it to defendant that day or shortly thereafter. He added to it the following language: "ANY SPECIAL REQUIREMENTS WILL BE AN EXTRA CHARGE TO THE OWNER." He also wrote across the page headed "Warranty and Claim Agreement": "No warranty from HOW."

Defendant commenced the site preparation and applied for a building permit, which was approved on October 23. Between October 2 and October 24, defendant and Marsh had several discussions, and other changes were made in the specifications. The building's final form was settled on by October 24, and the document reflecting the final structural changes and the price changes associated with them was signed by Marsh and defendant on that date. The amount of defendant's price credit had still not been determined.

About this time, Marsh inspected the building site and, on or shortly after October 24, informed defendant that the excavation was unacceptable and that additional work was needed to correct it. On October 30, defendant informed Marsh that he wanted to cancel the contract, because he was dissatisfied with the building location and because there were problems in financing its construction. In a letter, Marsh informed defendant that he would be expected to repay plaintiff for its expenses to date. On November 12, Marsh discovered that someone else was constructing the building for defendant in accordance with the plans prepared by plaintiff.[2]

In his first assignment, defendant contends that plaintiff failed to establish the existence of a valid contract between the parties. He argues that their agreement was too indefinite to be enforced, because he and plaintiff had not agreed with finality on all of the essential terms,

_____

[2] Defendant testified that the real reason he changed builders was that he had lost faith in plaintiff, but he did not give plaintiff these reasons because it would not have been very "tactful."

particularly the final price. Alternatively, he argues that Marsh's modification of the documents that he had signed on September 24 constituted a rejection of a proposed contract or a material alteration of an existing contract either of which discharged him from any obligation.

In regard to defendant's first argument, the general law in Oregon requires

> "that before there can be a valid contract there must be a meeting of the minds as to all of its terms; that nothing can be left for future *negotiation,* and that if any portion of the contract is not agreed upon, or *if no method is agreed upon by which such a term or provision can be settled,* there is no contract." *Phillips v. Johnson,* 266 Or 544, 555, 514 P2d 1337 (1973). (Emphasis supplied.)

Along these lines, a leading commentator has stated that,

> "* * * If the parties provide a practicable, objective method for determining this price or compensation, not leaving it to the future will of the parties themselves, there is no such indefiniteness or uncertainty as will prevent the agreement from being an enforceable contract. The same is true if they agree upon payment of a 'reasonable' price or compensation. * * *." 1 Corbin, Contracts, § 97, 424-25 (1963).

■ Here there were a number of contract terms still to be settled at the time the agreement was formalized on September 24, including changes in the price and the specification for the building. Irrespective of whether the agreement was enforceable at that time, however, we are satisfied that a definite agreement had been reached by October 24. By that time, specifications as to the building were settled, and defendant had signed a document acknowledging the most recent changes in structure and price. Only one significant item remained to be settled: fixing the amount by which the final price would be reduced, because of items to be eliminated from the standard house model. That amount was not to be "negotiated," however. Plaintiff's profit margin had already been determined and was to be preserved. Accordingly, the amount of the reduction in price was to reflect the amount by which plaintiff's construction costs would be reduced, *e.g.,* by omitting the fixtures. Although the parties might eventually have disagreed as to those costs, the correct figure was,

nevertheless, a question of fact, rather than a term to be decided by negotiation, and plaintiff had the usual obligation of good faith, which required it to compute that figure accurately. The contract price was substantially more definite than a "reasonable price."

■■ With regard to defendant's second argument, it is well-established that conduct can manifest acceptance of an offer or acquiescence in a modification. *See Snyder v. Pynn,* 50 Or App 449, 455, 623 P2d 1090 (1981). Regardless of whether Marsh's October 2 letter constituted a counter-offer or modification (or merely the putting into writing of terms already understood), defendant's conduct in securing the building permit and commencing the preparation of the building site, after his receipt of the letter, clearly indicates that he understood that he and plaintiff had entered into a contract.

In his second assignment, defendant contends that it was improper to award plaintiff actual damages, because the following contract provision provides for liquidated damages in the event of a breach by defendant:

"I have, this date, received from Undersigned $200.00 as a BINDER on the Contract between Undersigned and ADAIR HOMES INC. to construct a dwelling, as contained in this Breakdown which is not a part of the contract price, and is not to be deducted from the contract price.

"In the event that financing and/or a building permit, cannot be obtained, 50% of this BINDER shall be returned to the owner.

"Otherwise, the total BINDER shall become the property of ADAIR HOMES INC."

The problem with defendant's argument is that he did not establish that this provision is a liquidated damages clause.

■■ For a contractual provision to be considered an enforceable provision for liquidated damages, it must be shown that it was meant to provide for damages for breach of the contract, that the actual damages are difficult to estimate and that there is a reasonable relation between the damages agreed upon and any foreseeable loss. *Dean Vincent, Inc. v. McDonough,* 281 Or 239, 574 P2d 1096

(1978). The quoted provision is not denominated a liquidated damages clause, and it does not state, or imply, that either party is *limited* to $200 in the event of a breach. Moreover, this contract is not one in which actual damages are difficult to estimate, and there does not appear to be a reasonable relationship between the $200 sum and any foreseeable loss from a breach by defendant. Defendant testified that he understood that he could "back out" at any time and lose only $200. It strains credulity to believe that the parties intended to limit plaintiff to $200 damages if, for example, defendant repudiated the contract after the building was three-quarters completed. The trial court correctly concluded that this provision was not intended as one for liquidated damages and that it does not bar recovery of actual damages.

■ ■  In his third assignment, defendant contends that the court erred in excluding evidence of plaintiff's gross sales. On direct examination, Marsh testified to the amount of plaintiff's lost profits and gave a reasonable explanation of how he arrived at the figure. On cross-examination, defendant asked Marsh what plaintiff's taxable income was "for that year." Plaintiff objected on the ground that that information is unrelated to plaintiff's profits on one house. Defendant responded, "Well, your Honor, all of the financial information has to do with the profit on any given house." The objection was sustained. Defendant then asked Marsh the amount of plaintiff's gross sales, and plaintiff objected for the same reason. Defendant did not respond to this objection, and it was sustained. Although we can imagine circumstances in which gross sales or taxable income may be relevant, at least as starting points, in determining the lost profit on a single sale, defendant did not explain to the trial court, or to us, how this evidence, which appears on its face to be collateral, would be an aid in determining lost profits in this case. Evidence which may have had probative value, but which also raises the danger of possible prejudice and of prolonging a trial by the introduction of collateral issues, may be excluded in the discretion of the trial judge. *Plourd v. Southern Pac. Transp. Co.,* 272 Or 35, 43-44, 534 P2d 965 (1975). The trial court did not abuse its discretion in sustaining the objection.

Affirmed.