In re BFA LIQUIDATION
TRUST, Debtor.

New Asset Subsidiary, L.L.C., an Arizona limited liability company,
Defendant/Appellant,

v.

Robert B. Zelms and Linda K. Zelms, husband and wife, et al.,
Plaintiffs/Appellees.

No. CIV 04–0406–PHX–EHC.

United States District Court,
D. Arizona.

Sept. 27, 2005.

William F. Begley, Philip G. Mitchell, Esq, Craig J. Bolton, Esq, Jennings Haug & Cunningham LLP, Phoenix, AZ, for Defendant/Appellant.

Sean P. O'Brien, Esq, Timothy W. Barton, Gust Rosenfeld PLC, Phoenix, AZ, for Plaintiffs/Appellees.

## ORDER

CARROLL, District Judge.

Plaintiffs/Appellees ("Appellees") filed an Appeal of the Bankruptcy Court's grant of summary judgment for the Defendant/Appellant ("Appellant") on count one of Appellees's Second Amended Complaint, which alleged breach of contract. [Dkt. 1]. The Appeal is fully briefed.

The Appeal turns on whether an offer to release individual lots in a subdivision from a deed of trust on the entire subdivision for payment of $12,500 for each lot released is enforceable against Appellant.

### Background

William Blair ("Blair") managed a real estate development company known as Desert Diamond Estates, L.L.C. ("Desert Diamond"). In October 1997, one of the Debtor companies, New Church Ventures Credit Corporation ("New Church"), extended Blair a line of credit to use in developing a parcel of land into a residential subdivision, and Blair executed an $800,000.00 Multiple Advance Promissory Note in favor of New Church ("Blair Note"). To secure the note, Blair, on behalf of Desert Diamond, executed a Deed of Trust and Assignment of Rents ("New Church Deed") for Lots 1 through 78 of the subdivision, naming New Church as the Beneficiary. The New Church Deed has no provisions governing the release of individual lots from the New Church Deed.

Desert Diamond sought government approval for the subdivision. ATI Title Agency ("ATI") assisted with this process. On June 19, 1998, ATI sent a letter to New Church asking New Church to provide terms for the release of individual lots from the New Church Deed. ATI needed the partial release terms because the Arizona Department of Real Estate required provision for the release of lots encumbered by the New Church Deed before it would issue a subdivision report.

In June 1998, Dennis McKelvie ("McKelvie"), assistant to New Church's attorney, Thomas Grabinski, sent a letter ("McKelvie Letter") to ATI, offering to release individual lots from the New Church Deed for $12,500.00 per lot. The

substantive portion of the letter reads: "The Beneficiary of the above-referenced Deed of Trust, New Church Ventures Credit Corporation, an Arizona corporation, will release any encumbered lot, in any order of sale, for the release price of $12,500.00." [Dkt. 16, app. 3].

Desert Diamond submitted the McKelvie Letter to the Arizona Department of Real Estate to gain approval of its application for a public subdivision report. Desert Diamond also subdivided the property and, through its related entity Cholla Homes, L.L.C., which is also managed by Blair, began selling individual lots in the subdivision.

New Church, together with the Baptist Foundation of Arizona, Inc., the Arizona Southern Baptist New Church Ventures, Inc., and other related entities filed for Chapter 11 Bankruptcy[1] in November 1999. The Bankruptcy Court established a liquidation plan, creating Appellant New Asset Subsidiary, L.L.C. Appellant became the holder of the Blair Note and succeeded to New Church's beneficial interest in the New Church Deed.

In November 1998, the Blair Note was in default. Appellant demanded payment from Blair and Desert Diamond, who did not pay. In January 2001, Appellant discovered that Desert Diamond, through Cholla Homes, L.L.C., was selling individual lots in the subdivision even though the entire property was subject to the New Church Deed. Some of the lots were sold with sales documents mentioning payments to New Church, but only one of those payments was for the lot release price of $12,500, the rest ranged from $4,200 to $29,000. None of these payments were ever actually made to New Church.

Fidelity National Title Insurance Company ("Fidelity") acted as the title insurer and escrow agent for each of these lot sales. Appellant notified Fidelity by letter sent on January 31, 2001 that it had a lien on the lots that had not been released. [Dkt. 7E, app. 19, ex. A]. Appellant sent a second letter February 26, 2001. [Dkt. 7E, app. 19, ex. B]. Appellant did not receive a response to either letter.

In July 2001, Appellant filed a Notice of Trustee's Sale in the Official Records of the Maricopa County Recorder, Document No. 2001–0598510. This Notice involved the following lots: "Lots 1 through 5, 7, 9 through 11, 13, 16, 23, 25 through 28, 32 through 34, 36 through 39, 42 through 45, 48 through 55, 58, 61 through 63, 65, 68 through 71, 73, and 76 through 78."[2] [Dkt. 14, p. 18]. In October 2001, the purchasers of the lots ("Appellees") initiated an adversary proceeding in the United States Bankruptcy Court[3] to enjoin the Trustee's Sale of the property.

Both parties moved for summary judgment. On February 12, 2004, the Bankruptcy Court granted summary judgment for Appellees on count one of Appellees's Second Amended Complaint, which alleged breach of the terms of the McKelvie Letter. The Bankruptcy Court granted summary judgment for Appellant on count two for promissory estoppel; that ruling is not challenged in this appeal.

Consequently, the Bankruptcy Court enjoined the Trustee's Sale and required Appellant to release 22 of the individual lots from the New Church Deed upon payment

1. Referred to as, *In re: BFA Liquidation Trust,* Chapter 11 proceedings re: all cases (Case Nos. 99–13275–ECF–GBN through 99–13364–ECF–GBN).

2. Appellant later cancelled the Notice of Trustee's Sale with respect to Lots 11, 33, 34 and 58.

3. Adversary No. 01–1108–GBN.

by Appellees of $12,500 for each lot to be released. As part of the same order, the Bankruptcy Court ordered Appellees to pay $275,000 (to release 22 lots at the $12,500 release price), minus the amount of their attorneys' fees award, to Appellant. Appellant was ordered to accept the payment and release the 22 lots to Appellees.

On February 25, 2004, Appellant filed this Appeal challenging the Bankruptcy Court's grant of summary judgment in favor of the Appellees on count one of the Second Amended Complaint.

### Legal Standard

▪ The Court reviews the Bankruptcy Court's decision to grant summary judgment de novo. *Parker v. Community First Bank*, 123 F.3d 1243, 1245 (9th Cir. 1997). Granting summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56(c).

### Discussion

Appellant makes three principal arguments: that the McKelvie Letter is not a modification of the New Church Deed; that bankruptcy law allows the Trustee, acting through Appellant, to avoid the effect of the McKelvie Letter because it was unrecorded; and that Appellees cannot exercise their partial release right because the Blair Note is in default.

### Modification of the New Church Deed

▪ Under Arizona law, the McKelvie Letter can only modify the New Church Deed if each of the following elements are met: "(1) an offer to modify the contract, (2) assent to or acceptance of that offer, and (3) consideration." *Demasse v. ITT Corp.*, 194 Ariz. 500, 506, 984 P.2d 1138, 1144 (1999). Appellant does not contend that the McKelvie Letter was not an offer to modify the contract or that there is no consideration. The issue is whether the McKelvie Letter was accepted.

▪ An offer may be accepted in any reasonable manner, unless the offer specifies the manner of acceptance or excludes certain manners of acceptance. RESTATEMENT (SECOND) OF CONTRACTS, § 30 (1981). Conduct can be a reasonable manner of accepting an offer. *In re Estate of Mariotte*, 127 Ariz. 291, 292, 619 P.2d 1068, 1069 (Ariz.Ct.App.1980) (offeree accepted the offer by performing the conduct bargained for in the offer). Conduct is not an acceptance in a reasonable manner unless the offeror may infer from the conduct that the offeree is assenting to the terms of the offer. RESTATEMENT (SECOND) OF CONTRACTS, § 19(2) (1981); *see Contempo Constr. Co. v. Mountain States Tel. & Tel. Co.*, 153 Ariz. 279, 281, 736 P.2d 13, 15 ("acceptance is 'a manifestation of assent to the terms made by the offeree' ").

In appropriate circumstances, seeking government approval of a property development plan may indicate assent to the terms of the offer. In *Adair Homes, Inc. v. Jarrell*, 59 Or.App. 80, 650 P.2d 180 (1982) (cited with approval in *Ancell v. Union Station Associates, Inc.*, 166 Ariz. 457, 460, 803 P.2d 450, 453 (Ariz.App. 1990)), the court found a binding contract where the parties negotiated a building contract, the defendant obtained a building permit, and the parties later agreed on building plans and price. Analyzing the act of obtaining a building permit the court said: the "defendant's conduct in securing the building permit [on October 23, 1979] and commencing the preparation of the building site, after his receipt of the letter, clearly indicates that he understood that he and plaintiff had entered into a contract." *Id.*, 59 Or.App. at 85, 650 P.2d at

183. The court concluded that the plaintiff also understood the parties had entered into a contract, saying "we are satisfied that a definite agreement had been reached by October 24. By that time, specifications as to the building were settled, and defendant had signed a document acknowledging the most recent changes in structure and price." *Id.,* 59 Or.App. at 84, 650 P.2d at 183. Government approval, therefore, may be a reasonable manner of acceptance when coupled with negotiation between the parties and later conduct demonstrating the parties have formed an agreement.

Those same circumstances are present in this case. As the parties negotiated before the defendant sought a building permit in *Adair Homes, Inc.,* 59 Or.App. at 82–83, 650 P.2d at 181–182, the parties here engaged in negotiation before Desert Diamond sought government approval of the subdivision. Acting on behalf of Desert Diamond, ATI told New Church that the Arizona Department of Real Estate would not issue a public subdivision report allowing the subdivision unless New Church agreed to release the lots. In response to ATI's request for release terms, New Church offered to release the lots, sending the McKelvie Letter to ATI.

Just as the defendant in *Adair Homes, Inc.,* 59 Or.App. at 85, 650 P.2d at 183, sought a building permit after the negotiations, Desert Diamond sought government approval after discussing the need for release terms. Desert Diamond submitted the McKelvie Letter to the Department of Real Estate, receiving a public subdivision report.

As a later agreement on plans and price demonstrated a contract in *Adair Homes, Inc.,* 59 Or.App. at 84, 650 P.2d at 183, the later conduct of the parties demonstrates they had formed an agreement to release lots from the New Church Deed for $12,500 per lot. Desert Diamond subdivided the property and began selling individual lots, actions it could not lawfully take without having provisions releasing the lots from the New Church Deed–provisions available only in the McKelvie Letter. Appellant, by this time having succeeded to New Church's interest in the New Church Deed, sent letters to Fidelity on January 31, 2001 [Dkt. 7E, app. 19, ex. A] and February 26, 2001 [Dkt. 7E, app. 19, ex. B] regarding the sale of subdivision lots. These letters indicate New Asset believed provisions for lot release existed because both letters called Fidelity to account for lots sold without first seeking release from the New Church Deed. New Asset believed there were provisions for the release of lots– and again, the only provisions available were those in the McKelvie Letter. The conduct of the parties demonstrates that Desert Diamond assented to the terms of the McKelvie Letter and that the parties are bound to the terms of the McKelvie Letter.

### Trustee's Power to Avoid an Unrecorded Modification to a Deed of Trust

■ Appellant argues that the McKelvie Letter, modifying the New Church Deed of Trust, cannot be enforced because it was not recorded and bankruptcy law gives Appellant all protections available to bona fide purchasers, including those available under Arizona's recording statutes. Under Arizona law, an unrecorded deed of trust "shall be void as to creditors and subsequent purchasers for valuable consideration without notice." Ariz.Rev.Stat. Ann. § 33–412(A) (2005). On the other hand, unrecorded instruments are binding "as between the parties and their heirs, and as to all subsequent purchasers with notice thereof, or without valuable consideration." Ariz.Rev.Stat. Ann. § 33–412(B) (2005). To seek the protections of the recording statutes, Appellant would nor-

mally have to demonstrate that it is a purchaser for valuable consideration and without notice of the McKelvie Letter.

Instead of arguing it is a purchaser for valuable consideration without notice of the McKelvie Letter, Appellant claims that it should be given the protections available under the Arizona recording statutes because of its role as the agent of the Bankruptcy Trustee. The Trustee "may avoid any obligation incurred by the debtor that is voidable by" "a bona fide purchaser of real property, ..., from the debtor." 11 U.S.C. § 544(a)(3) (2005).

■ The avoidance power may applied only if the disputed obligation is connected to the debtor's real property. This is so because the Court asks whether a hypothetical bona fide purchaser of the debtor's real property, not the debtor's personal property, could have avoided the obligation. 5 COLLIER ON BANKRUPTCY, ¶ 544.08 (Lawrence P. King ed. 15th ed. rev.2001); *see Willson v. MLA, Inc.,* 153 B.R. 1002, 1009 ("Section 544(a)(3) gives a trustee the status of a bona fide purchaser of real property."). It would be irrelevant to determine what protections are available to a bona fide purchaser of debtor's real property if the disputed obligation is not connected to the debtor's real property.

Here, the lot release obligation is connected to the New Church Deed. The Court must determine whether the New Church Deed, a deed of trust governed by Arizona law, is real property according to § 544(a)(3).

An interest in real property is not necessarily real property according to § 544(a)(3) because an interest must be more than a transfer of bare legal title to constitute real property according to § 544(a)(3). *Willson v. MLA, Inc.,* 153 B.R. 1002, 1009 (Bankr.N.D.Ga.1993) (holding the Trustee could not use the avoidance power under § 544(a)(3) to avoid an obligation connected to a deed of trust because under Florida law a deed of trust only transfers legal title to the property). This is so because § 544(a)(3) does not refer to "a bona fide purchaser of debtor's interest in real property," but instead refers to "a bona fide purchaser of debtor's real property." Based on its choice of words, "it is doubtful that Congress intended § 544(a)(3) to come into play when the underlying real property is not in dispute." *Id.,* 153 B.R. at 1009. After all, in enacting § 544(a)(3) "Congress never granted to the trustee the rights of a bona fide purchaser or holder in due course of a negotiable instrument." *In re Columbia Pacific Mortgage., Inc.,* 20 B.R. 259, 263 (Bankr.W.D.Wash.1981) (deed of trust not real property under Washington law). Congress granted the Trustee the rights of a bona fide purchaser of debtor's real property, not the rights of a bona fide purchaser of debtor's security interest.

■ The Court looks to state law in determining whether a deed of trust is real property. *See In re Marino,* 813 F.2d 1562, 1565–66 (9th Cir.1987) (the court looked to California law in determining a leasehold is personal property). In Arizona, a deed of trust is not real property under § 544(a)(3) because a deed of trust confers only legal title and "the trustor remains free to transfer the property and continues to enjoy all other incidents of ownership." *In re Bisbee,* 157 Ariz. 31, 34, 754 P.2d 1135, 1138 (1988) (holding that failure to name a trustee does not invalidate a deed of trust). Rather than being real property, "a deed of trust is little more than a mortgage with a power to convey upon default." *Ibid.* And "a mortgage is not a conveyance;" "it is nothing but a lien for the security of money." *Steinfeld v. State,* 37 Ariz. 389, 392, 294 P. 834, 835 (1930) (holding that a tax lien was

extinguished at the foreclosure sale). Finding that a deed of trust is not real property is appropriate because the holder of a deed of trust will not come into possession of the land in the normal course of events. In fact, the holder of a deed of trust has only the power to sell the property at foreclosure. *Ibid.* As defined by Arizona law, a deed of trust is not real property as that term is used in § 544(a)(3). Thus, a bankruptcy trustee cannot use the § 544(a)(3) avoidance power to avoid an obligation connected to a deed of trust governed by Arizona law.

Here, Appellant seeks to use the avoidance power to avoid the partial release provisions the McKelvie Letter added to the New Church Deed. The McKelvie Letter was not recorded, and under Arizona law cannot be enforced against a bona fide purchaser. The New Church Deed, however, is a deed of trust governed by Arizona law, and as such is not real property as that term is used in § 544(a)(3). Appellant, therefore, cannot use § 544(a)(3) to claim the protections of a purchaser for value without notice under Arizona law.

### Exercise of Release Right After Default

█ Finally, Appellant argues that Appellees cannot enforce the McKelvie Letter because of the default on the Blair Note. Appellant cites a host of cases for the proposition that neither a mortgagor nor a mortgagor's transferee can exercise a lien release right after the mortgage or deed of trust is in default. Unlike the present case involving exercise by lot buyers in a subdivision, the cases cited by Appellant all involve exercise of the release right by the mortgagor or a transferee succeeding to an interest in the entire mortgaged estate. *Toole–Tietzen & Co. v. Colorado River Dev. Co.,* 38 F.2d 850 (S.D.Cal.1930) (exercise by mortgagor); *Clarke v. Cowan,* 206 Mass. 252, 92 N.E. 474 (1910) (holder of second mortgage seeking to assert

mortgagor's right of release); *Reed v. Jones,* 133 Mass. 116, 1882 WL 11028 (1882) (exercise by mortgagor's transferee); *Pierce v. Kneeland,* 16 Wis. 672, 1863 WL 2329 (1863) (exercise by subsequent purchasers of the mortgaged property); *Gilles v. Dyer,* 93 N.J.Eq. 348, 116 A. 704) (N.J.Ch.1922) (mortgagor's assignee); *Fulton v. Jones,* 167 A.D. 765, 153 N.Y.S. 87 (N.Y.A.D.1915) (mortgagor). None of those cases involve a transferee succeeding only to a lot on the mortgaged estate, such as the purchaser of a lot in a subdivision.

The rule barring exercise of the release right after default does not apply when the party seeking to exercise the lien right is the purchaser of a lot in a subdivision because individual purchasers need to obtain the release of their lots from a mortgage or deed of trust encumbering the entire property. *See e.g. Chrisman v. Hay,* 43 F. 552, 555 (S.D.Iowa 1890); *Vawter v. Crafts,* 41 Minn. 14, 42 N.W. 483 (Minn.1889) (individual lot purchaser could exercise release right after mortgagor defaulted); *Reilly v. City Deposit Bank & Trust Co.,* 322 Pa. 577, 185 A. 620 (1936) (allowing buyer of individual lots to exercise release right even after mortgagor defaulted on mortgage on entire property). *Chrisman* is analogous to the present case. Here, Desert Diamond mortgaged the entire property, even though it intended to subdivide the property. New Church agreed to release individual lots from the mortgage to obtain subdivision approval. Desert Diamond began selling lots and defaulted on the mortgage. In *Chrisman,* the defendant mortgaged the lots on blocks one to thirty-two to the plaintiffs to secure a loan for the purchase of the entire property. The mortgage provided that plaintiffs would release individual lots for $32.80 per lot. *Id.,* 43 F. at 552. The defendant then sold a number of the lots subject to the mortgage without paying

the lot release price to the plaintiffs. *Id.,* 43 F. at 555. The defendant then defaulted on the mortgage.

The court in *Chrisman* held that the mortgage on the entire property did not apply to the lots already sold and ordered the plaintiffs to release the lots already sold for $32.80 each. 43 F. at 555. The court found that the lot release provision demonstrated that the parties intended for individual lots to be sold and released from the mortgage on the entire property. Otherwise the individual purchasers would suffer the injustice of being responsible for the entire mortgage when they had bought only a portion of the land. *Ibid.*

The same injustice would result in this case if Appellees could not exercise the release provision because of New Church's default. Appellees would each own only a portion of the land subject to the New Church Deed, but their land would be liable for the entire debt secured by the New Church Deed. This injustice is precisely what the parties intended to prevent by agreeing to the lot release provisions contained in the McKelvie Letter. Regardless of New Church's default, Appellees can exercise the release right found in the McKelvie Letter.

### Conclusion

The McKelvie Letter modified the New Church Deed, adding partial release provisions. The New Church Deed is not real property subject to the Trustee's avoidance powers under 11 U.S.C. § 544(a)(3). Appellees can exercise the partial release right even after default.

Accordingly,

**IT IS ORDERED** that Appellant's Appeal from the Bankruptcy Court's grant of summary judgment for Appellees on count one of the Second Amended Complaint is **DENIED.**

**IT IS FURTHER ORDERED** that the matter is remanded to the Bankruptcy Court for further proceedings.