Argued and submitted April 5, affirmed November 1, 2006

Michelle MARTIN;
Michelle Hochstetler;
and Robin Cahill,
individually and on behalf of
all other similarly situated persons,
*Respondents,*

*v.*

COMCAST OF CALIFORNIA/
COLORADO/FLORIDA/OREGON, INC.,
a foreign corporation;
Comcast of Oregon I, Inc.,
a foreign corporation;
Comcast of Oregon II, Inc.,
a foreign corporation;
Comcast of Tualatin Valley, Inc.,
a foreign corporation;
Comcast of Washington/Oregon SMATV I, LLC,
a foreign corporation;
Comcast of Washington/Oregon SMATV II, LLC,
a foreign corporation;
Comcast of Novato,
a foreign corporation;
Comcast of Illinois/Ohio/Oregon, LLC,
a foreign corporation;
Comcast,
a foreign corporation;
Comcast of Montana III, Inc.,
a foreign corporation;
Comcast ABB Network Solutions, Inc.,
a foreign corporation;
Comcast ABB of Oregon, Inc.,
a foreign corporation;
and Comcast ABB of Payette, Inc.,
a foreign corporation,
*Appellants.*

0407-07245; A127818

146 P3d 380

Jaime A. Bianchi argued the cause for appellants. With him on the briefs were Rima Y. Mullins and White & Case LLP, Miami, Florida, and Duane A. Bosworth, Kevin H. Kono, and Davis Wright Tremaine LLP.

David Sugerman argued the cause for respondents. With him on the brief was Paul & Sugerman, PC.

Before Schuman, Presiding Judge, and Landau* and Ortega, Judges.

SCHUMAN, P. J.

_____
* Landau, J., *vice* Ceniceros, S. J.

## SCHUMAN, P. J.

Plaintiffs in this class action are cable television subscribers who claim that defendants, various regional Comcast corporations (to which we refer collectively as "Comcast") engaged in unlawful billing practices. Comcast filed a motion to compel arbitration. The trial court denied the motion on the ground that the various agreements between Comcast and plaintiffs did not create a valid arbitration agreement. Comcast then filed this interlocutory appeal, ORS 36.730(1)(a), arguing that the trial court erred in deciding the validity of the arbitration agreement under state law instead of federal law and that, even if state law applies, the trial court did not apply it correctly. We conclude that state law applies and that the trial court applied it correctly. We therefore affirm and remand for trial.[1]

Plaintiffs fall into two categories: those who began their subscriptions with Comcast (then known as "AT&T Broadband") before November 2001 and those who began thereafter. November 2001 divides the groups because at that time Comcast sent its existing customers a notice entitled "Policies & Practices—Notice to Customers Regarding Policies, Complaint Procedures & Dispute Resolution." That "P&P notice" apparently introduced an arbitration clause into the existing subscription agreement and informed subscribers that their continued use of their cable service after receipt of the P&P notice constituted acceptance of its terms. That P&P notice is not in the record. Comcast also asserts that those subscribers received a "bill stuffer" that referred to the proposed arbitration term that was contained in the P&P notice. It stated the following:

"IMPORTANT LEGAL NOTICE

"INCLUDED IN THIS MONTH'S BILLING STATEMENT IS A REVISED VERSION OF AT&T BROADBAND'S

---

[1] Preliminarily, we note two issues of terminology. The trial court has not certified plaintiffs as a class. When we refer to them by that term, we do not intend to prejudge the issue; for purposes of this opinion, "class" means "asserted class." Second, by using the term "arbitration agreement," we do not mean to imply that there was, in fact, a valid agreement to arbitrate. When we refer to the "arbitration agreement" in this case, we mean the "asserted arbitration agreement."

NOTICE TO CUSTOMERS REGARDING POLICIES, COMPLAINT PROCEDURES AND DISPUTE RESOLUTION (THE '[P&P] NOTICE').

"THE [P&P] NOTICE CONTAINS IMPORTANT INFORMATION CONCERNING YOUR USE OF AT&T BROADBAND'S SERVICES. AMONG OTHER CHANGES, WE HAVE IMPLEMENTED A NEW COMPLAINT RESOLUTION PROCEDURE INCLUDING PROVISIONS FOR FINAL AND BINDING ARBITRATION OF DISPUTES. THESE PROVISIONS AFFECT LEGAL RIGHTS THAT YOU MAY HAVE HAD PREVIOUSLY. IT IS IMPORTANT THAT YOU READ THE [P&P] NOTICE CAREFULLY.

"THE POLICIES AND PRACTICES CONTAINED IN THE [P&P] NOTICE WILL BECOME EFFECTIVE THIRTY (30) DAYS AFTER THE DATE OF THE ENCLOSED STATEMENT. YOUR CONTINUED USE OF AT&T BROADBAND SERVICES AFTER THIRTY (30) DAYS OPERATES AS YOUR CONSENT TO THESE POLICIES AND PRACTICES."

(Uppercase in original.)

The group of plaintiffs who began their subscriptions after November 2001 received a similar "Policies and Procedures" notice, according to Comcast, with their first billing. That P&P notice also apparently contained a mandatory arbitration agreement and informed subscribers that use of the service constituted acceptance of the P&P notice's provisions. Again, no copy of the 2001 P&P notice appears in the record. The record does contain P&P notices that Comcast sent to subscribers in 2002 and 2003. Both of those P&P notices included a provision stating, in pertinent part:

"10.   MANDATORY AND BINDING ARBITRATION

"IF WE ARE UNABLE TO RESOLVE INFORMALLY ANY CLAIM OR DISPUTE RELATED TO OR ARISING OUT OF THE AGREEMENT OR THE SERVICES PROVIDED, WE HAVE AGREED TO BINDING ARBITRATION EXCEPT AS PROVIDED BELOW. * * *

"THERE SHALL BE NO RIGHT OR AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED ON A CLASS ACTION OR CONSOLIDATED BASIS * * *."

(Uppercase in original.) The P&P notices did not require the subscriber's signature or other evidence of receipt.

Comcast asserts that, regardless of when a class member subscribed, he or she would have received the 2001 P&P notice or its functional equivalent. For the first group, the P&P notice purported to modify existing subscriptions by adding the arbitration term; for the second group, it supplied an arbitration term as part of a new subscription agreement. Thus, according to Comcast, all class members are bound by those terms, and this dispute, which arises out of the subscription, is arbitrable, contrary to the trial court's ruling.

Plaintiffs respond that this court lacks jurisdiction to review the trial court's denial of Comcast's petition to compel arbitration; that, even if we have jurisdiction, we should affirm because the trial court correctly determined that no valid arbitration agreements exist; and that, even if such agreements exist, they are unconscionable and therefore cannot be enforced. For the reasons set out below, we conclude that we have jurisdiction. On the merits, we conclude that the trial court did not err in finding that no valid arbitration agreement exists between any of plaintiffs and Comcast. We therefore do not reach the question of unconscionability.

■   We begin with the question of our jurisdiction. Plaintiffs assert that ORS 36.730(1), which confers jurisdiction on this court for interlocutory appeals from "order[s] denying a petition to compel arbitration," does not apply to this case. Plaintiffs rely on the provisions governing the effective dates of that statute, part of the Uniform Arbitration Act (UAA), ORS 36.600 to 36.740. Those provisions state:

"(1)   Sections 1 to 30 of this 2003 Act [36.600 to 36.740] govern an agreement to arbitrate made on or after the effective date of this 2003 Act [January 1, 2004].

"* * * * *

"(3)   On or after September 1, 2004, sections 1 to 30 of this 2003 Act govern an agreement to arbitrate whenever made."

Or Laws 2003, ch 598, § 3, *compiled as a note after* ORS 36.600 (bracketed text in original). Plaintiffs point out (and Comcast does not contest) that subsection (1) does not confer

jurisdiction, because the agreements at issue were made between 2001 and 2003, that is, before January 1, 2004.

Plaintiffs and Comcast part company, however, with respect to subsection (3). Comcast argues that the UAA (including its provision conferring jurisdiction on us for this interlocutory appeal) applies because, under subsection (3), as of September 1, 2004, the UAA governs all arbitration agreements whenever made, including arbitration agreements that are disputed in *pending litigation*. Thus, the UAA applies because the motion to compel arbitration, and the court's ruling on that motion, occurred after September 1, 2004: The motion was filed in October 2004, a hearing was held in January 2005, and the order issued on February 18, 2005. Plaintiffs, on the other hand, contend that subsection (3) confers jurisdiction only for *actions filed* on or after September 1, 2004, and the present case was filed in July 2004. Otherwise—that is, if subsection (3) confers jurisdiction in all cases *pending* on September 1, 2004, regardless of when the arbitration agreement was made—the effect would be to nullify the operation of the first subsection (because the UAA would apply to some agreements made before the effective date of the UAA) and the legislature would have included in subsection (3) a "notwithstanding" clause: "*Notwithstanding subsection (1)*, on or after September 1, 2004," the Act applies to all arbitration agreements, whenever made.

We reject plaintiffs' interpretation of subsection (3) for several reasons. First, it would require us to insert the words "for actions filed" before "[o]n or after September 1, 2004," contrary to the mandate in ORS 174.010 that we not insert a substantive provision that the legislature has omitted. Second, if plaintiffs' argument that we must reject any reading of subsection (3) that is inconsistent with subsection (1) were valid, we would have to reject their interpretation as well. Under that interpretation, for example, an action filed after September 1, 2004, involving an arbitration agreement made in 2003 would, under subsection (3), be governed by the UAA—contrary to subsection (1). In short, plaintiffs point to nothing in the text of the Act to indicate that it does not mean what it says: that, beginning on September 1, 2004, the Act applies to all arbitration agreements.

That interpretation is strengthened by the provision's context. Another provision of the UAA relating to its effective date states that it does "not affect an action or proceeding commenced * * * before the effective date of this 2003 Act," that is, January 1, 2004. Or Laws 2003, ch 598, § 31, *compiled as a note after* ORS 36.600. It seems unlikely that the legislature would in one provision state that the Act does not apply to actions filed before January 1, 2004—thereby implying that it *does* apply to actions filed *after* January 1, 2004, including actions filed in the interval between the effective date and September 1, 2004—and in another provision imply that it does *not* apply to actions filed before September 1, 2004, including actions filed between the effective date and September 1, 2004. The implication, instead, is that the UAA applies after September 1, 2004, to actions "commenced" after January 1, 2004. This case, commenced in June 2004, falls into that category.

■    We turn to the merits of Comcast's assignments of error. In its first assignment, Comcast asserts that the trial court erred in using state law to determine the contracts' arbitrability. The argument involves the interplay between the Federal Arbitration Act, 9 USC §§ 1-16 (FAA), and the Cable Television Consumer Protection Act of 1992, 47 USC §§ 521-571 (Cable Act). Comcast and plaintiffs both acknowledge that the arbitration clause in the contracts with subscribers is governed by the FAA, that the FAA requires enforcement only of valid arbitration agreements, and that the validity of an agreement is determined under state contract law. *Allied-Bruce Terminix Cos. v. Dobson*, 513 US 265, 281, 115 S Ct 834, 130 L Ed 2d 753 (1995); *Doctor's Associates, Inc. v. Casarotto*, 517 US 681, 684, 116 S Ct 1652, 134 L Ed 2d 902 (1996) (quoting *Perry v. Thomas*, 482 US 483, 492-93 n 9, 107 S Ct 2520, 96 L Ed 2d 426 (1987)). The parties, then, agree that, in the first instance, Oregon law governs the question whether the purported arbitration agreements were validly formed.

According to Comcast, however, Oregon law is preempted by the Cable Act, in particular by section 552(c), which provides, "A cable operator may provide notice of service and rate changes to subscribers using any reasonable

written means at its sole discretion." In other words, Comcast maintains that the FAA points to state law as the authoritative source to determine the validity of the arbitration agreement but that state law itself gives way under the preemptive force of the Cable Act, a different federal law. Comcast's argument, then, ultimately rests on the theory of preemption.

■ Preemption is the name given to the doctrine implementing the Supremacy Clause in Article VI of the United States Constitution, which states that federal law "shall be the supreme Law of the Land * * * any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." An often-cited statement of United States Supreme Court preemption jurisprudence under the Supremacy Clause explains its operation as follows:

"It is well established that within constitutional limits Congress may pre-empt state authority by so stating in express terms. Absent explicit pre-emptive language, Congress' intent to supersede state law altogether may be found from a scheme of federal regulation * * * so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, because the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject, or because the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. Even where Congress has not entirely displaced state regulation in a specific area, state law is pre-empted to the extent that it actually conflicts with federal law. Such a conflict arises when compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Pacific Gas & Elec. v. Energy Resources Comm'n*, 461 US 190, 203-04, 103 S Ct 1713, 75 L Ed 2d 752 (1983) (internal quotation marks and citations omitted). Preemption, then, is either express or implicit. Implicit preemption, in turn, is either "occupying the field" preemption or "conflict" preemption. "Conflict" preemption occurs either when simultaneous compliance with federal and state law is physically impossible or when compliance with state law interferes with the

objective of federal law. Further, "state laws can be preempted by federal regulations as well as by federal statutes." *Hillsborough County, Fla. v. Automated Medical Labs., Inc.*, 471 US 707, 713, 105 S Ct 2371, 85 L Ed 2d 714 (1985). "The question whether a certain state action is preempted by federal law is one of congressional intent." *Allis-Chalmers Corp. v. Lneck*, 471 US 202, 208, 105 S Ct 1904, 85 L Ed 2d 206 (1985). In every preemption case, and particularly those involving areas of law that the states have traditionally occupied, the court must " 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Medtronic, Inc. v. Lohr*, 518 US 470, 485, 116 S Ct 2240, 135 L Ed 2d 700 (1996) (quoting *Hillsborough County, Fla.*, 471 US at 715).

Comcast invokes the second type of conflict preemption, arguing that, first, section 552 of the Cable Act "governs all aspects of the modification of agreements related to the provision of cable services" including how those modifications may be presented to subscribers and how subscribers can accept or reject them, and, second, that application of any aspect of state contract law would interfere with the objective Congress had in mind when it enacted section 552. The argument is necessarily in two parts: first, that federal law governs the entire transaction in question (offer and acceptance), and, second, that it does so to the exclusion of state law. For the reasons that follow, we are not persuaded.

We begin with the text of section 552(c) and its relevant implementing regulation. The statute provides:

"Subscriber notice[:]

"A cable operator may provide notice of service and rate changes to subscribers using any reasonable written means at its sole discretion. Notwithstanding section 543(b)(6) of this title or any other provision of this chapter, a cable operator shall not be required to provide prior notice of any rate change that is the result of a regulatory fee, franchise fee, or any other fee, tax, assessment, or charge of any kind imposed by any Federal agency, State, or franchising authority on the transaction between the operator and the subscriber."

The particular implementing regulation on which Comcast relies is 47 CFR § 76.1603(b):

> "Customers will be notified of any changes in rates, programming services or channel positions as soon as possible in writing. Notice must be given to subscribers a minimum of thirty (30) days in advance of such changes if the change is within the control of the cable operator. In addition, the cable operator shall notify subscribers 30 days in advance of any significant changes in the other information required by § 76.1602."

According to Comcast, these provisions set out a complete statement of how cable operators and subscribers can agree to changes in their contractual relationship: cable operators have complete discretion to use "any reasonable written means" of providing "notice," that notice amounts to an offer to modify the existing contract, and customers accept the offer by continuing to use the operator's service for more than 30 days after receiving the notice.

We agree that the quoted provisions instruct cable operators like Comcast how they may notify customers of a change in service and rates, and that such notice can serve as an offer to modify an existing contract. We also agree that, if Oregon attempted to enact or enforce a more restrictive notice requirement, it would directly conflict with the Cable Act and be preempted by it. Plaintiffs, however, argue that the Cable Act's provisions manifestly have nothing to do with the manner in which customers can *accept* the offer. They contend that a regulation imposing on Comcast an obligation to provide customers with at least 30 days' notice of rate and programming changes is a far cry from a regulation under which customers are deemed to have accepted those rate and programming changes if they do not unsubscribe within 30 days. Requirements designed to provide a method of notice, they maintain, do not govern the acceptance of terms by the person who receives the notice.

We need not decide the merits of that argument, however, because we agree with plaintiffs' alternative argument. The Cable Act does not govern the acceptance of the particular change at issue in this case: a change imposing mandatory arbitration as a substitute for litigation. The

Cable Act, regulations, and legislative history deal only with "service and rate changes." Although the regulations implementing the Cable Act indicate that "complaint procedures" are a "customer service" about which a cable operator must inform subscribers at the time of installation, 47 CFR § 76.1602(b)(6), we are unwilling to call mandatory arbitration a "complaint procedure" service provided by the cable operator. Rather, it is a procedure of which the operator and customer might avail themselves when the operator's complaint procedures fail.

In addition, the very regulation on which Comcast relies specifically applies only to "changes in rates, *programming* services or channel positions." 47 CFR § 76.1603(b) (emphasis added). Changes to dispute resolution methods are not governed by the regulation. We therefore conclude that the Cable Act does not deal with, and therefore cannot preempt state laws regarding, the means by which consumers can accept an operator's proposed modification in the service agreement relating to dispute resolution procedures.

Even if we could interpret the Cable Act to cover modification acceptance, we would still find no preemption. As noted above, Comcast relies on implicit preemption, arguing that application of state contract formation law would " 'stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Pacific Gas & Elec.*, 461 US at 204 (quoting *Hines v. Davidowitz*, 312 US 52, 67, 61 S Ct 399, 85 L Ed 581 (1941)). According to Comcast, the "full purposes and objectives" of the Act include "providing cable operators with a flexible, uniform method for modifying the terms of cable service agreements"—an objective that would be frustrated by application of 50 states' contract law. Comcast infers this objective from, again, one sentence in the voluminous legislative history of the Cable Act:

"The Committee believes this increased flexibility will reduce operator costs and streamline the implementation [of modifications] * * * while at the same time continuing to ensure that cable subscribers are effectively and timely informed in writing of changes in rates and services."

HR Rep No 204, 104th Cong, *reprinted in* 1996 USCCAN 10, 79. The problems with Comcast's arguments are obvious. First, Comcast's leap from "flexibility" (Congress's word) to "flexible, uniform method" (Comcast's term) defies explanation: if Congress sought to give operators flexibility, then it obviously could not also have required uniformity. The conclusion is inescapable that Congress wanted flexibility; it is Comcast that wants the opposite. But it cannot achieve that objective by paraphrasing "X" as "X and not X."

Second, the text of the Cable Act itself is incompatible with a conclusion that its purposes include uniformity to the exclusion of state law variations. Section 552(d)(2), for example, states:

> "Nothing in this subchapter shall be construed to prevent the establishment or enforcement of any municipal law or regulation, or any State law, concerning customer service that imposes customer service requirements that exceed the standards set by the Commission under this section, or that addresses matters not addressed by the standards set by the Commission under this section."

In short, we reject Comcast's contention that the Cable Act preempts state law with respect to contract modification, other than to prohibit states from limiting the means that operators can use to notify subscribers of proposed changes. In particular, as relevant to this case, we reject Comcast's contention that the Cable Act preempts Oregon law regarding how an offeree accepts a proposed contract modification relating to dispute resolution procedures. *See also* In the Matter of Policy and Rules Concerning the Interstate, Interexchange Marketplace, 12 FCCR 15014, 15057 (Aug 15, 1997) (order of Federal Communications Commission explaining that the Communications Act, of which the Cable Act is part, "does not govern * * * contract formation and breach of contract").

■ Thus, we must determine whether, under Oregon law, a valid arbitration agreement exists between Comcast and plaintiffs. The trial court's order denying Comcast's motion to compel arbitration includes the two classes of plaintiffs but does not distinguish between them. It simply denies the motion in its entirety. In a letter opinion preceding

the judgment, the trial court explained its reasoning as follows:

> "Oregon has consistently followed an 'objective test' in the interpretation and enforcement of contract law. * * * 'The law of contracts is not concerned with the parties[7] undisclosed intents and ideas. It gives heed only to their communications and overt acts.' * * * On this record, the communications and overt acts of the parties do not manifest a meeting of the minds with respect to a *modification* of the subscriber agreements."

(Citations omitted; emphasis added.) Comcast, noting that this explanation refers only to *modification* of subscriber agreements, asserts that

> "the trial court erred in failing to distinguish between subscribers who had entered into their initial cable service agreement prior to November 2001, and the inclusion of the arbitration agreement and those who subscribed after November 2001. For those subscribers who entered into their initial cable service agreement after November 2001, the arbitration provision is part of their initial agreement and the issue of modification is irrelevant. As to these subscribers, the trial court erred in not compelling arbitration."

However, Comcast's insistence that the court should have distinguished between pre-November 2001 subscribers, who received notice of a contract modification adding a mandatory arbitration clause, from post-November 2001 subscribers, who received the mandatory arbitration clause from the outset, cannot stand. That is so because the record does not contain any original subscription agreement containing an arbitration clause. From the record before us, we are unable to conclude that Comcast ever included a mandatory arbitration clause in any original subscriber agreement.

Rather, the record contains three potentially relevant items, all of which—individually and considered together—fall short of demonstrating the existence of original subscriptions containing an arbitration term. As noted, there is no November 2001 P&P notice in the record to indicate the terms of subscription agreements for subscribers who initiated subscriptions on November 2001 or during the rest of that year. The record contains instead the declaration

of Christa Pickle, a communications and marketing official for Comcast, stating only that new subscribers after November 2001 "would have been provided with" a copy of a P&P notice containing the arbitration clause. She did not declare that these subscribers would have received the notice as part of their original agreement or when, after initiating service, they would have received it. The record does not contain a copy of the notice to which she referred nor of any pre-2002 P&P notice.

The record does, however, contain the text of two versions of a P&P notice, one released in 2002 and another in 2003. Both contain the arbitration provision. They state, "This notice is being provided to you, *as a new or existing* customer * * *." (Emphasis added.) Bradley Kaplan, a Comcast officer, averred that the 2002 P&P notice was included in "[Comcast's] billing service * * * in the November 2002 monthly billing cycle of all current subscribers in the state of Oregon," and that Comcast sent the 2003 P&P notice in the November 2003 billing cycle. In sum, there is nothing in the record demonstrating that the post-November 2001 subscribers accepted a P&P notice with an arbitration term in an original agreement. Thus, in failing to distinguish between the law of contract modification and contract formation—a distinction we do not necessarily believe would make any relevant difference in this case in any event—the trial court did not err. Only the law of contract modification is relevant.

Regarding that law, Comcast appears to argue that if a contract modification specifies that continued receipt of services after a stated time period constitutes acceptance, inaction on the part of the recipient (or, in Comcast's terms, the overt act of not cancelling) is *per se* acceptance as a matter of law. As the cases cited by both parties demonstrate, however, that is not an accurate statement of the law. Inaction *might* constitute acceptance, but whether it does or not in any particular case depends on that case's facts and circumstances. *See, e.g., Bennett v. Farmers Ins. Co.*, 332 Or 138, 153-54, 26 P3d 785 (2001) ("[T]he law requires only evidence of 'mutual assent,' whether that assent is expressed through an offer and acceptance or is manifested by conduct."); *Adair Homes, Inc. v. Jarrell*, 59 Or App 80, 85, 650 P2d 180 (1982) ("[I]t is well-established that conduct *can*

manifest acceptance of an offer or acquiescence in a modification." (Emphasis added.)). And, as the Oregon Supreme Court has recently explained, "Mutual assent, or what historically was considered as the 'meeting of the minds' requirement, *may be* expressed in words or inferred from the action of the parties. * * * Whether a statement or act is a manifestation of assent * * * is a question of fact * * *." *Bennett,* 332 Or at 148 (citations omitted; emphasis added); *accord Palmer v. Wheeler,* 258 Or 41, 49, 481 P2d 68 (1971) ("[W]hether there was a sufficient meeting of the minds upon all terms" is a question of fact.). Further, when assent to a modification occurs by conduct, that conduct must be "unequivocal." *See Marnon v. Vaughan Motor Co.,* 184 Or 103, 158-59, 194 P2d 992 (1948).

In the present case, the trial court stated, "On this record, the communications and overt acts of the parties do not manifest a meeting of the minds with respect to a modification of the subscriber agreements." The court's statement of the law is correct: Without an objectively manifested meeting of the minds, no contract existed. And we must accept the trial court's factual finding—there was no objectively manifested meeting of the minds—if there is any evidence in the record to support it. *See Waverly Const. Co. v. Gold Invest. Co.,* 60 Or App 101, 103 n 1, 652 P2d 880 (1982) (whether there is a meeting of the minds is a fact question); Or Const, Art VII (Amended), § 3. The record contains an example of the type of "bill stuffer" reportedly sent to cable subscribers, and the context in which it was sent. Those documents support the inference that a subscriber could easily have continued using Comcast's service without ever being aware of the arbitration clause. Indeed, the lead plaintiff, Martin, averred that she was unaware of receiving the notices that purported to change her cable subscription. Evidence, then, supports the court's finding that nonaction did not signify acceptance of the arbitration term.

In sum: We have jurisdiction in this interlocutory appeal. We conclude that the trial court did not err in choosing to apply Oregon law to the question whether there was a valid arbitration agreement, nor did it err in how it applied

that law. Thus, no valid arbitration agreement exists in this case and, for that reason, the FAA does not compel arbitration.

Affirmed.